IN

# THE SUPREME COURT

OF

## PENNSYLVANIA.

---

### EASTERN DISTRICT—PHILADELPHIA, 1874.

---

### Wells *et al. versus* Bain *et al.* and Fitler *et al.*
### Donnelly *versus* Fitler *et al.*

1. An existing lawful government of the people cannot be altered or abolished unless by their consent legally obtained.

2. The Bill of Rights embraces but three recognised modes by which the people of the state can give their consent to altering an existing Constitution. (1.) The mode provided in the Constitution. (2.) A law raising a body for revision and giving it the powers of the people. (3.) Revolution.

3. A law is the only means by which an authorized consent of the people can be lawfully obtained in a state of peace; irregular action, by which a certain number of the people assume to act for the whole, is revolutionary.

4. The authority of part to speak for the whole is only when it is at an election authorized by law.

5. The Act of June 2d 1871, submitted to the people the question of calling a convention to amend the Constitution;—to be held subject to the laws relating to the general election, the vote was in favor of calling such convention. This vote only authorized the calling a convention;—it was not a mandate on the legislature to make the call.

6. The Act of April 11th 1872, authorized the election of delegates, and gave them power to propose a new Constitution or amendments and authorized one-third of the members of the convention to require a separate vote on any amendment; it required the convention to submit the amendments to the voters at such time "and in such manner as the convention shall prescribe," and that the election to decide upon the amendments should "be conducted as the general elections now are." By the election laws, the election in Philadelphia was to be conducted by inspectors, &c. The convention, by an ordinance, appointed persons named, to have direction of the election, to fill vacancies, to appoint judges and inspectors, to make report of their action to

(39)

[Wells *v.* Bain.]

the president of the convention, &c. *Held*, that the ordinance being contrary to the Act of 1872, was void.

7. The power of the convention to act for the people was derived from the Act of 1872 and they had no other authority.

8. Whether one-third of the members of the convention requested a separate submission of an amendment, and whether the request was in an orderly way, was for the convention to decide, and could not after their action be inquired into.

9. Errors of procedure in the convention cannot be inquired into—the convention having acted within the scope of its powers.

December 2d 1873. At Nisi Prius, before GORDON, J., with AGNEW, C. J., SHARSWOOD, WILLIAMS and MERCUR, JJ., as assessors.

The matter considered arose upon two bills in equity in the Supreme Court, No. 13 and No. 14, to January Term 1874.

No. 13 was a bill filed by Francis Wells and others, citizens and voters of Philadelphia, against James Bain, Alexander McCuen and Thomas M. Locke, commissioners of the city of Philadelphia, and Edwin H. Fitler, Edward Browning, John P. Verree, Henry S. Hagert and John O. James, commissioners of election under an ordinance of the convention to revise and amend the Constitution of Pennsylvania.

No. 14 was a bill filed by John H. Donnelly, an inspector of elections of the Fifth ward of Philadelphia, against Edwin H. Fitler and others, commissioners of elections, &c., as above stated.

Bill No. 13 averred that Fitler and the other commissioners proposed to hold an election in Philadelphia on the 3d Tuesday of December 1873, and to assume and exercise the powers, &c., conferred on them by an ordinance of the convention, and to set aside the requirements of the 6th section of the Act of April 11th 1872, providing for the call of a convention to amend the constitution, and to prevent the election officers of Philadelphia from discharging their duties, and that Bain and the other city commissioners proposed to expend large sums of money belonging to the city in defraying the expenses of such election; that the aforesaid ordinance was attempted to be justified by the said Act of April 11, 1872, which authorized the convention only to prepare the form for an amended constitution and submit it to the people at an election to be held according to law; that by the ordinance the proposed amended constitution was to be submitted to the people as a whole, whereas it was required by one-third of the convention that Article 5, relating to the judiciary, should be submitted separately to the people.

The prayer was for an injunction, restraining the defendants from expending any money in relation to the election, and the commissioners from holding such election.

Bill No. 14 averred that the plaintiff was a duly appointed inspector of elections in the Fifth ward of Philadelphia, and under a

[Wells v. Bain.]

penalty for the performance of his duties as such inspector. The bill further averred as in bill No. 13, and further, that Fitler and the other commissioners designed to prevent him and the other election officers of Philadelphia from performing their duty as such officers, and to appoint other election officers in their stead.

The prayer was for an injunction to restrain the commissioners from interfering with the plaintiff in the exercise of his office as inspector, and from appointing other election officers in his place.·

The Act of June 2d 1871, "To authorize a popular vote upon the question of calling a convention to amend the constitution of Pennsylvania," provided:

Sect. 1. That the question of calling a convention to amend the constitution of this Commonwealth be submitted to a vote of the people at the general election to be held on the second Tuesday of October next, the said question to be voted upon in manner following, to wit: * * * and all votes cast as aforesaid shall be received, counted and returned by the proper election officers and return judges as votes for governor are received, counted and returned under existing laws.

Sect. 2. That the election aforesaid shall be held and be subject to all the provisions of law which apply to general elections; the sheriffs of the several counties shall give notice of this act in their election proclamation the present year, and the governor shall cause all the returns of the said election, as received by the secretary of the Commonwealth, to be laid before the legislature at its next annual session.

· The Act of April 11th 1872, "To provide for calling a convention to amend the constitution," provided:

Sect. 1. That at the general election to be held on the second Tuesday of October next, there shall be elected by the qualified electors of this Commonwealth delegates to a convention to revise and amend the constitution of this state; the said convention shall consist of one hundred and thirty-three members, to be elected in the manner following: Twenty-eight members thereof shall be elected in the state at large as follows:—Each voter of the state shall vote for not more than fourteen candidates, and the twenty-eight highest in vote shall be declared elected; ninety-nine delegates shall be apportioned to and elected from the different senatorial districts of the state, three delegates to be elected for each senator therefrom; and in choosing all district delegates each voter shall be entitled to vote for not more than two of the members to be chosen from his district, and the three candidates highest in vote shall be declared elected, except in the county of Allegheny, forming the twenty-third senatorial district, where no voter shall vote for more than six candidates, and the nine highest in vote shall be elected; and in the counties of Luzerne, Monroe and Pike, forming the thirteenth senatorial district, where no voter

[Wells *v.* Bain.]

shall vote for more than four candidates, and the six highest in vote shall be elected; and six additional delegates shall be chosen from the city of Philadelphia by a vote at large in said city; and in their election no voter shall vote for more than three candidates, and the six highest in vote shall be declared elected.

Sect. 2. The following regulations shall apply to the aforesaid election to be held on the second Tuesday of October next, and to returns of the same:—

*First.*—The said election shall be held and conducted by the proper election officers of the several election districts of the Commonwealth, and shall be governed and regulated in all respects by the general election laws of the Commonwealth, so far as the same shall be applicable thereto and not inconsistent with the provisions of this act. * * *.

*Fourth.*—In the city of Philadelphia the return judges shall meet at the State House, at ten o'clock, on Thursday next following the election, and make out the returns for said city of the votes cast therein for delegates at large and city and district delegates to be members of the convention; the return judges of the several election districts within each county of the state, excluding Philadelphia, shall meet on the Friday next following the election at the usual place for the meeting of the return judges of their county, and shall make out full and accurate returns for the county of the votes cast therein for members of the convention and for district members of the same; and the proceedings of the return judges of the said city of Philadelphia, and of the several counties of the Commonwealth, in the making of their returns, shall be the same as those prescribed for return judges in the case of an election for governor, except that returns transmitted to the secretary of the Commonwealth shall be addressed to that officer alone and not to the Speaker of the Senate.

*Fifth.*—The prothonotary of Philadelphia and the prothonotaries of the several counties shall, with reference to such returns, promptly and faithfully perform all the duties enjoined upon them by the eighty-fourth and eighty-fifth sections of the general election Act of July 2d, one thousand eight hundred and thirty-nine. * * *.

Sect. 3. It shall be the duty of the delegates elected as aforesaid to assemble in convention, in the hall of the House of Representatives, at the state capitol in Harrisburg, on the second Tuesday of November, one thousand eight hundred and seventy-two, at twelve o'clock M., that day, with general powers of adjournment as to time and place; and it shall be the duty of the secretary of the Commonwealth to call the convention to order at that time of its assembling, and to submit all the returns of election in his possession, * * * * * and thereupon said convention shall proceed to organize by electing one of their number

as president, and, after the members are sworn in, such other officers as may be needed in the transaction of business.

Sect. 4. Said convention, so elected, assembled and organized, shall have power to propose to the citizens of this Commonwealth, for their approval or rejection, a new constitution or amendments to the present one, or specific amendments to be voted for separately, which shall be engrossed and signed by the president and chief clerk, and delivered to the secretary of the Commonwealth, by whom and under whose direction it or they shall be entered on record in his office, and published once a week, in at least two newspapers in each county where two papers are published, for four weeks next preceding the day of election that shall be held for the adoption or rejection of the constitution or amendments so submitted: *Provided*, That one-third of all the members of the convention shall have the right to require the separate and distinct submission to a popular vote of any change and amendment proposed by the convention: *And provided further*, That nothing herein contained shall authorize the said convention to change the language, or to alter in any manner the several provisions, of the ninth article of the present constitution, commonly known as the declaration of rights, but the same shall be excepted from the powers given to said convention, and shall be and remain inviolate for ever: *And provided further,* That the said convention shall not create, establish or submit any proposition for the establishment of a court or courts with exclusive equity jurisdiction.

Sect. 5. The convention shall submit the amendments agreed to by it to the qualified voters of the state, for their adoption or rejection, at such time or times, and in such manner as the convention shall prescribe, subject, however, to the limitation as to the separate submission of amendments contained in this act; and all amendments accepted by a majority vote of the electors voting thereon shall become a part of the constitution.

Sect. 6. The election to decide for or against the adoption of the new constitution or specific amendments shall be conducted as the general elections of this Commonwealth are now by law conducted; and it shall be the duty of the return judges of the respective counties, first having ascertained the number of votes given for or against the new constitution or separate or specific amendments, if any, to make out duplicate returns thereof, expressed in words at length, one of which returns so made shall be filed in the office of the prothonotary of the proper county, and the other sealed and directed to the secretary of the Commonwealth; which said returns shall be opened, counted and published as the returns for governor are now by law counted and published; and when the number of votes given for or against the new or revised constitution, or for or against separate specific amendments, if any, shall have been summed up and ascertained and the

[Wells *v.* Bain.]

duplicate certificates thereof delivered to the proper officers, the governor shall declare, by proclamation, the result of the election, and if a majority of the votes polled shall be for the new or revised constitution, or for any separate specific amendments, such new or revised constitution and separate specific amendments shall be thenceforth the constitution of this Commonwealth. * * *.

Sect. 8. That in case of vacancies in the membership of said convention, the same shall be filled as follows :—If such vacancy shall be of a member at large of the convention, those members at large who shall have been voted for by the same voters, or by a majority of the same voters who shall have voted for and elected the member whose place is to be filled, shall fill such vacancy ; if such a vacancy shall be of a district or city member of the convention, those members at large of the convention who shall have been voted for by the same or by a majority of the same voters who shall have voted for such district or city member shall fill such vacancy ; in either case, the appointment to fill a vacancy shall be made by the members at large aforesaid, or by a majority of them, in writing; and all such written appointments shall be filed among the convention records.

Sect. 9. That the secretary of the Commonwealth shall prepare a form of notice of the election to be held for the purpose of choosing members of the aforesaid convention, including such portions of this act as shall be necessary and proper for the information of voters and election officers at the said election, as to their respective rights and duties in relation thereto ; which said form so prepared shall be transmitted by him to the sheriffs of the several counties, to be observed by them in making proclamation of the holding of said election in their respective jurisdictions. * * *

The ordinance is as follows :—

An ordinance for submitting the amended Constitution of Pennsylvania to a vote of the qualified electors thereof.

*Be it ordained by the Constitutional Convention of the Commonwealth of Pennsylvania, as follows :—*

1. That the amended Constitution prepared by this convention be submitted to the qualified electors of the Commonwealth for their adoption or rejection, at an election to be held on the third Tuesday of December next; except as hereinafter ordered and directed, the said election shall be held and conducted by the regular election officers in the several election districts throughout the Commonwealth, under all the regulations and provisions of existing laws relating to general elections; and the sheriffs of the several counties shall give at least twenty days' notice of said election by proclamation.

2. The secretary of the Commonwealth shall, at least twenty days before the said election, furnish to the commissioners of each county, a sufficient number of properly prepared circulars of

[Wells v. Bain.]

instructions. The commissioners of the several counties shall cause to be printed at least three times as many ballots of affirmative votes as there are voters in each county—and the same number of negative votes; and the said commissioners shall, at least five days before said election, cause to be fairly distributed to the several election districts in their respective counties, the said ballots, tally-lists, returns, circulars of instructions, and such other books and papers as may be necessary. The ballots shall be printed or written in the following form: On the outside the words "New Constitution;" in the inside for all persons giving affirmative votes the words "For the New Constitution," and for all persons giving negative votes the words "Against the New Constitution."

3. If it shall appear that a majority of the votes polled are for the new constitution, then it shall be the Constitution of the Commonwealth of Pennsylvania on and after the first day of January, in the year of our Lord one thousand eight hundred and seventy-four; but if it shall appear that a majority of the votes polled were against the new constitution, then it shall be rejected and be null and void.

4. Five Commissioners of Election, viz.: Edwin H. Fitler, Edward Browning, John P. Verree, Henry S. Hagert and John O. James, are hereby appointed by this convention, who shall have direction of the election upon this amended Constitution in the city of Philadelphia. The said commissioners shall be duly sworn or affirmed to perform their duties with impartiality and fidelity. They shall also have power to fill vacancies in their own number. It shall be the duty of said commissioners, or a majority of them, and they shall have authority to make a registration of voters for the several election divisions of said city, and to furnish the lists so made to the election officers of each precinct or division; to distribute the tickets for said city provided for by this ordinance to be used at the election; to appoint a judge and two inspectors for each election division, by whom the election therein shall be held and conducted, and to give all necessary instructions to the election officers regarding their duties in holding the election and in making returns thereof. No person shall serve as an election officer who would be disqualified under section 15, article 8, of the new constitution. The general return of the election in the said city shall be opened, computed and certified before the said commissioners, and with their approval—which approval shall be endorsed upon the return. They shall make report, directed to the President of this Convention, of their official action under this ordinance and concerning the conduct of the said election within the said city.

The judges and inspectors aforesaid shall conduct the election in all respects conformably to the general election laws of this

[Wells *v*. Bain.]

Commonwealth, and with like powers and duties to those of ordinary election officers. Each inspector shall appoint one clerk to assist the board in the performance of its duties, and all the election officers shall be duly sworn or affirmed according to law, and shall possess all the qualifications required by law of election officers in this Commonwealth. At said election any duly qualified elector who shall be unregistered, shall be permitted to vote upon making proof of his right to the election officers, according to the general election laws of this Commonwealth. Return inspectors and their clerks and an hourly count of the votes shall be dispensed with, but overseers of election may he selected for any precinct by said election commissioners, whose duties and powers shall be the same as those of overseers of election in said city under existing election laws applicable thereto. Returns of the election shall be made in said city as in the case of an election for governor, but a triplicate general return for said city shall be made out and forwarded to the President of this Convention at Harrisburg, as is hereafter provided in case of county returns.

5. In each of the counties of the Commonwealth (except Philadelphia), the returns of the election shall be made as in the case of an election for governor, but the return judges in each county shall make out a triplicate county return and transmit the same, within five days after the election, directed to the President of this Convention at Harrisburg.

Done in Convention this third day of November, in the year of our Lord one thousand eight hundred and seventy-three.

The cases were argued by *R. S. Ashurst*, *J. E. Gowen* and *B. H. Brewster*, for the plaintiffs, and by *C. R. Buckalew*, *W. H. Armstrong* and *G. W. Biddle*, for the defendants.

The opinion of the court was delivered, December 6th 1873, by
Agnew, C. J.—Since the Declaration of Independence in 1776, it has been an axiom of the American people, that all just government is founded in the consent of the people. This is recognised in the second section of the declaration of rights of the Constitution of Pennsylvania, which affirms that the people "have at all times an inalienable and indefeasible right to alter, reform or abolish their government in such manner as they may think proper." A self-evident corollary is, that an existing lawful government of the people cannot be altered or abolished unless by the consent of the same people, and this consent must be legally gathered or obtained. The people here meant are the whole—those who constitute the entire state, male and female citizens, infants and adults. A mere majority of those persons who are qualified as electors are not the people, though when authorized to do so, they may represent the whole people.

[Wells v. Bain.]

The words "in such manner as they may think proper," in the declaration of rights, embrace but three known recognised modes by which the whole people, the state, can give their consent to an alteration of an existing lawful frame of government, viz.:

1. The mode provided in the existing constitution.

2. A law, as the instrumental process of raising the body for revision and conveying to it the powers of the people.

3. A revolution.

The first two are peaceful means through which the consent of the people to alteration is obtained, and by which the existing government consents to be displaced without revolution. The government gives its consent, either by pursuing the mode provided in the constitution, or by passing a law to call a convention. If consent be not so given by the existing government the remedy of the people is in the third mode—revolution.

When a law becomes the instrumental process of amendment, it is not because the legislature possesses any inherent power to change the existing constitution through a convention, but because it is the only means through which an *authorized* consent of the whole people, the entire state, can be lawfully obtained in a state of peace. Irregular action, whereby a certain number of the people *assume* to act for the whole, is evidently revolutionary. The people, that entire body called the state, can be bound as a whole only by an act of authority proceeding from *themselves*. In a state of peaceful government they have conferred this authority upon a part to speak for the whole only at an election authorized by law. It is only when an election is authorized by law, the electors, who represent the state or whole people, are bound to attend, and if they do not, can be bound by the expression of the will of those who do attend. The electors who can pronounce the voice of the people are those alone who possess the qualifications sanctioned by the people in order to represent them, otherwise they speak for themselves only, and do not represent the people.

The people, having reserved the right to alter or abolish their form of government, have, in the same declaration of their rights, reserved the means of procuring a law as the instrumental process of so doing. The twentieth section is as follows:—

"The citizens have a right, in a peaceable manner, to assemble together for their common good, *and to apply to those invested with the powers of government* for redress of grievances *or other proper purposes*, by petition, address or remonstrance."

If the legislature, possessing these powers of government, be unwilling to pass a law to take the sense of the people, or to delegate to a convention *all* the powers the people desire to confer upon their delegates, the remedy is still in their own hands; they can elect new representatives that will. If their representatives are still unfaithful, or the government becomes tyrannical, the right

25 P. F. Smith—4

[Wells *v.* Bain.]

of revolution yet remains.   To what extent the Constitution of the United States controls this it is unnecessary now to inquire.

It is not pretended that the late convention sat as a revolutionary body, or in defiance of the existing government, and it did not proceed in the mode provided for amendment in the constitution, that being a legislative proceeding only.   It was, therefore, the offspring of *law*.   It had no other source of existence.   The process was an application or petition to the legislature to call a convention, the passage of a law to gather the sense of the people on the *question* whether a convention should be called; an election authorized by this law to take the sense of the whole people on this question, and, finally, the passage of a law to call the convention and define its powers and duties.   A law is the only form in which the legislature, the body invested with the powers of government, can act, and thereby its own consent be given and revolution avoided. The people having adopted a proceeding by law as the means of executing their will, having acted under it and chosen their delegates by virtue of its authority, submitted themselves to it, as their own selected and approved means of carrying out peacefully their purpose of amendment.   The law, being thus the instrument of their own choice to express their will, necessarily became the channel of their authority.   Having furnished no other means of arriving at their will, it is the only channel through which it has been conveyed.   The law, therefore, being the instrument of delegation, this warrant to the delegates from the people becomes the only chart of their powers.   The will of the people has been expressed in no other form, and the powers of the delegates, therefore, come in no other wise.

It will not do to assert that the whole original power of the people was conferred by the election.   This election itself was a part of the instrumental process of the law, the means provided by this very law, of selecting the delegates.   The law was the warrant for their election, and expressed the very terms chosen and adopted by the people, under which *they* delegated their power to these agents.   The delegates possess no inherent power, and when convened by the law at the time and place fixed in it, sit and act under it, as their letter of attorney from the people themselves, and can know and discover the will of the people only so far as they can discern it through this the only warrant they have ever received to act for the people.   If they claim through any other source, they must be able to point to it.

Outside of the law to take the sense of the people whether a convention should be called, and the law to call the convention, no other source has been or can be shown.   To make this more distinct, let us suppose a voluntary election unauthorized by law, and delegates elected.   It is plain a convention composed of such delegates would possess no power to displace the existing govern-

ment, and impose a new constitution on the whole people. Those voting at the unauthorized election had no power to represent or to bind those who did not choose to vote. A majority of the adult males having the qualifications of electors can bind the whole people only when they have authority to do so.

To make this still more plain. Suppose a constitution formed by a volunteer convention, assuming to represent the people, and an attempt to set it up and displace the existing lawful government. It is clear that neither the people as a whole nor the government having given their assent in any binding form, the executive, judiciary and all officers sworn to support the existing constitution would be bound, in maintenance of the lawfully-existing institutions of the people, to resist the usurpation, even to the whole extent of the force of the state. If overpowered, the new government would be established, not by peaceful means, but by actual revolution.

It follows, therefore, that in a state of peace a law is the only means by which the will of the whole people can be collected in an authorized form, and the powers of the people can be delegated to the agents who compose the convention. The form of the law is immaterial in this question of derivative authority. It may be a law to confer general authority or one to confer special authority. It may be an invitation in the first place, as was the Act of 1789, under which the convention of 1790 was convened, and an authority to the people to meet in primary assemblies to select delegates and confer on them unrestricted powers; or it may be a law to take the sense of the people on the question of calling a convention, and then a law to make the call and confer the powers the people intend to confer upon their agents. The power to pass the law carries with it of necessity that to frame and declare the terms of the law. The terms of delegation, which the people themselves declare, when acting under and by virtue of the law which they have called to their aid, as the instrumental process of conferring their authorities and reaching their purpose of amendment, become of necessity the terms of their own will. All outside of this channel is revolutionary, for it has neither the consent of the government nor of the people who have called the government to their aid and acted through it. The process of amendment being through the instrumentality of legislation, these laws must be enacted in the forms of the constitution and be interpreted by the rules which govern in the interpretation of laws.

The next inquiry is—What powers of the people were conferred upon the late convention? A change in the fundamental relations of the people and of that sacred compact which they have instituted to guard and protect their own rights and interests is one of vast, indeed most solemn import; for to impose a new constitution without authority, or to usurp powers not delegated, may

[Wells *v.* Bain.]

lead to bloodshed and ruin. The power to act, then, should be clearly conferred. The sacred fire from the altar of the people's authority cannot be snatched by unhallowed hands.

The present inquiry is not how much power *may* be conferred by law, but *what* power was conferred on this convention? A *law* must be passed according to the forms of the constitution. One of these is that no bill shall contain "more than one subject, which shall be clearly expressed in the title." The title of the Act of June 2d 1871, is "An act to authorize a popular vote upon the *question of calling* a convention to amend the constitution of Pennsylvania." The text of the act is: "That the *question of calling* a convention to amend the Constitution of this Commonwealth be submitted to a vote of the people at the general election, to be held," &c. The one subject of both title and text is the *question of calling* a convention. That *question* was *authorized* to be submitted to a popular vote. In that election each elector expressed his individual opinion on *that* question, and that alone, by voting "for a convention" or "against a convention." This *question* was answered in the affirmative by a majority of votes, and the people, answering the legislature, said: "You may call a convention." This was all the vote expressed. Each vote expressing the opinion of the elector on that *question*, the majority expressed no more, for the majority was composed of the sum total of the votes on that side. Thus an analysis of the act, both in its title and its text, demonstrates that the vote was not a delegation of power, except to the legislature. There is no principle of sound interpretation which can extend the voice of the elector or the sum total of those voices, beyond the question each was called to answer. The result of that vote, therefore, was that the legislature might call a convention. It was not in itself a call, nor did it declare when, how, or on what terms the call should be made. That, the very answer to the question proposed to the electors, necessarily left to those who asked their judgment on the propriety of making the call.

It was not even a mandate, further than the moral force contained in an expressed desire of the people. It is very evident, had the matter dropped there, and the legislature had made no call, no convention and no terms would ever have existed. Not a line, nor a word, nor a syllable in this act expresses an intent of the people to make the call themselves, or on what terms it shall be made, or what powers should be conferred. Did the people by this act, without an expressed intent, and by mere inference, intend to abdicate all their own power, their rights, their interests, and their duty to each other in favor of a body of mere agents, and to confer upon them, by a blank warrant, the absolute power to dictate their institutions, and to determine finally upon all their most cherished interests? If the argument be admitted for an instant that because nothing

[Wells *v*. Bain.]

was said in this law on the subject of *delegation*, therefore, greater powers were conferred than were granted in the subsequent Act of 1872, then all power belonging to the people passed, and they did grant by it the enormous power stated. Then, by a covert intent, hidden in the folds of this act, the people delegated power to repeal all laws, abolish all institutions, and drive from place the legislature, the governor, the judges, and every officer of the Commonwealth, without submitting the work of the delegates to the ratification of the people. If by an ordinance under a power derived from this Act of 1871, the delegates can set aside the lawfully-existing election laws for Philadelphia, where shall their power end? Can they draw money from the treasury to pay their own salaries? Can they seize and condemn a hall for their own use under the power of eminent domain? It is not possible, by any sound rule of interpretation, natural or civil, we can attribute to the Act of 1871, such an enormous, fearful, portentous delegation of power, founded on a vote upon the mere *question* of calling a convention. The result of the vote on this question declared the sense of the greater number of electors, that a convention might be called. But how called? It was not itself a call. It left that to those invested with the powers of government. In and of itself it conferred no authority upon the delegates, but left that to a subsequent act. The call proceeding from the legislature was necessarily by means of a *law*, for in no other form can the legislative will be expressed. When the people called in legislative aid to procure the call of a convention, they knew, therefore, that a *law* could be the only instrumental process the legislature could give; and a law being invoked, they knew that the power to legislate carried with it the power to frame the terms of the law. They knew still more, when they accepted the law as the means of making the call, that *they* adopted its terms by acting under it. When, therefore, they, in 1872, elected delegates under the Act of 1872, they elected them under the terms and provisions of that law, and none other, for there was no other law under which an authorized and binding election was or could be had. The people themselves, therefore, ratified and adopted the terms of the Act of 1872, as the terms on which they delegated their powers to those elected under it. The delegates so elected are clearly estopped, by the record itself, from denying the terms under which they hold their seats, for they hold them under the Act of 1872, and no other. The entire process of raising a convention and conferring upon it the powers of the people, was a matter of law, in a state of peace, under the forms of the constitution, through which the consent both of the people and of the existing government was given to prevent the convention from being or becoming a revolutionary body.

Accordingly, the Act of April 11th 1872, is entitled "An act

[Wells *v.* Bain.]

to provide for *calling a convention* to amend the constitution."
The text of the act is, "that at the general election to be held,
&c., there shall be elected by the qualified voters of the Common-
wealth, *delegates* to a convention to revise and amend the consti-
tution of the state," &c. The act then provides for the election, the
assembling of the delegates, their powers and duties, and the submis-
sion of the constitution or amendments agreed upon to a vote of
the people for adoption or rejection. When the people voted under
this law, did they not vote for delegates upon the express terms
that they should submit their work to the people for approval?
Did not every man who went to the polls do so with the belief in
his heart that, by the express condition on which his vote was
given, the delegates could not bind him without his subsequent
assent to what the delegates had done? On what principle of
interpretation of human action can the servant now set himself up
against the condition of his master and say the condition is void?
Who made it void? Not the electors; they voted upon it. The
people required the law, as the act of the existing government, to
which they had appealed under the Bill of Rights, to furnish them
legal process to raise a convention for revision of their fundamental
compact, and without which legal process the act of no one man
could bind another. This law, being unrepealed, and being acted
upon by the people, became their own delegation of authority—
the chart of the delegates to guide and control them in the duties
they were elected to perform as the servants of the people. With-
out this legislation the convention had not existed; and to exist
on terms not found in or contrary to the law, is to seek for a grant
of powers to be found nowhere else, except in a state of revolution,
and, therefore, do not exist in this peaceful process of amendment.

The absolute necessity of the convention to claim the protection
of the Act of 1872 is seen in another view. Of the one hundred
and thirty-three members of this body, less than one hundred in
number were elected by the people. Some never received a single
vote, but sat by the appointment of men themselves not elected by
the people at large. It is not meant to discuss the wisdom or the
merits of the so-called limited system of voting, by which a majo-
rity of the electors are prevented from voting against persons seeking
to represent them; but the purpose now is to show that without the
authority of this very Act of 1872, more than thirty-three mem-
bers of the body had no warrant whatever to represent the people.
On what principle of right, dominion or power, had these persons
any claim to exercise the power of the people, and by their votes,
perhaps, to fix upon a people they do not represent, the most
odious features of a proposed constitution? Is it not clear that
their whole delegated power to speak and to vote for the people
comes from the force and effort of the statute? They have that,
and none other.

[Wells *v.* Bain.]

In considering this question of delegated power some are apt to forget that the people are already under a constitution and an existing frame of government instituted by themselves, which stand as barriers to the exercise of the original powers of the people, unless in an authorized form. They glide insensibly into the domain of abstract rights, and clothe mere agents with primordial power. But delegated authority is *derived*, and those who claim it must show whence and how they derived it. Three and a half or four millions of people cannot assemble themselves together in their primary capacity—they can act only through constituted agencies. No one is entitled to represent them unless he can show their warrant—how and when he was constituted their agent. The great error of the argument of those who claim to be the people, or the delegates of the people, is in the use of the word *people*. Who are the people? Not so many as choose to assemble in a county, or a city, or a district, of their own mere will, and to say—we the people. Who gave them power to represent all others who stay away? Not even the press, that wide-spread and most powerful of all subordinate agencies, can speak for them by authority. The voice of the people can be heard only through an authorized form, for, as we have seen, without this authority a part cannot speak for the whole, and this brings us back to a law as the only authority by which the will of the whole people, the body politic called the state, can be collected under an existing lawful government. To wander outside of this channel is to run in search of original powers, which, though possessed by the people, they have conferred in no other form. If the power be *delegated*, it must be seen in the derivation, otherwise it does not exist. If, then, the delegates elected by the people themselves, under the Act of 1872, have greater powers than are contained in it, *when, where and how* did they obtain them? It is not in the Act of 1871, for that, as we have shown, decided but one question, and conferred but one power, to wit: That a convention might be called, and that the legislature might call it. There is no other source to which this convention can appeal, and not being found there it is found nowhere.

This brings us to an examination of the powers conferred by the Act of 1872, as the dernier resort. The power claimed for the convention is, by ordinance, to raise a commission to direct the election upon the amended constitution, in the city of Philadelphia, and to confer power on this commission to make a registration of voters, and furnish the lists so made to the election officers of each precinct; to appoint a judge and two inspectors for each division, by whom the election therein shall be *conducted*. This ordinance further claims the power to regulate the qualifications of the officers thus appointed to hold the election and to control the general returns of the election. It is clear, therefore, that the ordinance assumes a *present* power to displace the election officers now in

[Wells *v.* Bain.]

office under the election laws for the city, to substitute officers appointed under the authority of the convention, and to set aside these election laws so far as relates to the qualification of the officers and the manner in which the general returns shall be made, and in other respects not necessary to be noticed. The authority to do this is claimed under the fifth section of the Act of 1872, giving the convention power to *submit* the amendments, at such time or times, and in such manner as the convention shall prescribe, subject, however, to the limitation as to the separate submission of amendments contained in this act. It is argued that the manner of submission confers a power to *conduct the election* upon the *matter submitted.* To state the proposition is to refute it, for the manner of submitting the amendments is a totally different thing from conducting the election upon the submitted amendments. But it is argued that the fourth, fifth and sixth sections of the act are contradictory, unless the term manner shall be applied to the conducting of the election as well as to the manner of submitting the amendments. The very reverse is true. Each of the three sections has a different subject, and it is clearly provided for in its respective place. These three different subjects are: First, the power to propose amendments; second, the mode or manner in which these propositions shall be submitted, and third, the regulation of the election itself upon the propositions submitted. To be more specific, the fourth section confers the *power to propose* to the citizens for approval or rejection a new constitution or amendments to the present one, or specific amendments to be voted on separately. Then comes the fifth section, which deals not with the power to propose, but with the manner of submitting the thing proposed; that is, in whole or in parts. This is proved by the condition immediately annexed to the manner, to wit: *Subject*, however, to the limitation as to *separate submission* of amendments contained in this act, which was : " Provided, that one-third of all the members of the convention shall have the right to require the *separate submission to a popular vote* or any change and amendment proposed by the constitution." The word *manner* is one of large signification, but one thing is clear—it cannot exceed the subject it qualifies or belongs to. The incident cannot be extended beyond its principal. What then does the word manner qualify or pertain to in this section ? Clearly it is the submission—" Shall *submit* the *amendments*" "in such *manner* as the convention shall prescribe, subject to,"—subject to what ?—the limitation as to the *separate submission* of amendments. Can language be clearer to express the mode of submitting or placing the amendments before the people for their adoption or rejection ?

Now we come to the 6th section, which begins a different subject. " The *election* to decide for or against the adoption of the new constitution, or specific amendments, *shall be conducted as*

[Wells *v.* Bain.]

the *general elections* of this Commonwealth are *now by law conducted."* Thus the legislature said to the convention in these three sections—You shall have power to propose your work in three forms; you shall have power to determine the time and the manner in which these propositions shall be submitted; but the election by the citizens shall be conducted as the law itself directs as to general elections. The 6th section, as to how the election on the propositions submitted shall be conducted is mandatory, and is so for the best of reasons—it is the only legally authorized means of taking the sense of the people upon adoption of the amendments which can bind the whole people. In this way only can a majority of voters, who are not a majority of the people, bind them as the body politic or state. The legislature intended that the election should be conducted by known officers legally elected, and should be governed by a known system of laws with which the people are familiar, and thereby that they should both know and respect the authority under which the election should be held. No implication can be drawn from the word "manner" to contradict the plain and positive enactment that the election shall be conducted according to the laws governing general elections. It would violate the plainest rules for the interpretation of statutes to make the merest inference stand higher than an intent expressed in distinct language. It is, therefore, clear to our minds that the ordinance relating to the election in the city of Philadelphia is flatly opposed to the Act of 1872, and is therefore illegal and void. The prospective validation in the 32d section of the schedule only betrays the doubt the convention itself had of the validity of the ordinance in this respect.

The next question is one of great importance, but stands on a very different footing from that upon the ordinance—I mean the alleged refusal of the convention to submit the judiciary article separately to a vote of the people. The convention was clothed with express power to act upon the question of submitting the amendments in whole or in part. It is a deliberative body, having all the necessary authority to make rules for its own procedure, and to decide upon all questions falling within the scope of its authority. The power over the manner of submitting amendments is expressly conferred in the fifth section. It is true the law gives to one-third of all the members a right to require a separate submission of any amendment. But while this right is awarded to a minority of the body, it is one upon which the convention itself must act, and it must act according to its own rules of procedure. The question of a separate submission being one committed to the whole body, of which the requiring third is itself a part, it must be presumed that the decision of the body as a whole was rightly made, and either that the request was not made by a full one-third

[Wells *v.* Bain.]

of all the members, or, if made by one-third, it was not in a regular or orderly way.    It would be a violent presumption to suppose that the body would wilfully disregard their own oaths as well as a full and orderly request.    And if they did this wrong, no appeal is given to the judiciary, and the error can be corrected only by the people themselves, by rejecting the work of the convention.    If the people, notwithstanding, choose to ratify their work, with them lies the consequence.    Mere errors of procedure will then be of no avail.    The convention having in that matter acted within the scope of its undoubted power, we must take its decisions as final, and leave correction to the power to which it belongs.

Not to omit to notice the arguments drawn from precedents, we think none referred to throw much light on the general question in these cases—this power of the convention to pass the ordinance setting aside the election laws governing the city of Philadelphia and substituting provisions of its own.    Even the proceedings in 1789 in our own state, furnish a precedent of but little service. There the legislature not only invited the action of the people in primary assemblies, but in advance committed to their hands all the authority legislation can confer to act in those assemblies. The convention was summoned without restriction, and acted without trammel, while the people reserved no power of ratification, and subsequently disposed of all questions of power by living under and acting upon the constitution, thereby ratifying the work of the convention in the most efficacious manner.    The question before us is, can the convention, before they either proclaim a constitution themselves, if they have the power, or before any ratification, if they have not, pass an ordinance to repeal an existing system of law on a particular subject?    This is a question of power, not of wisdom.    However wise the substitution of their own election machinery for that provided by law for this city may be, the question is not for us.    We can decide only the question of power. At last, therefore, we must come to the decision on principle and in the light of reason, having a due regard to the rights, interests, welfare and peace of a people living under a recognised government of their own choice, and seeking to amend it in a peaceful way, and to such extent as they may deem salutary and wise.

The question of jurisdiction has been reserved for the conclusion.    The first remark to be made is, that all the departments of government are yet in full life and vigor, not being displaced by any authorized act of the people.    As a court we are still bound to administer justice as heretofore.    If the acts complained of in these bills are invasions of rights without authority, we must exercise our lawful jurisdiction to restrain them.    One of our equity powers is the prevention or restraint of the commission or continuance of acts contrary to law, and prejudicial to the interests of

[Wells v. Bain.]

the community or the rights of individuals.    Page v. Allen, 8 P. F. Smith 338, and the authorities cited by counsel are precedents sufficient to justify the exercise in this case.    Here the court is asked to restrain a body of men attempting to proceed contrary to law—to set aside the lawful election system of the city, and substitute an unlawful system in its place.    Their acts are not only contrary to law, but are prejudicial to the interests of the community, by endangering the rights of all the electors, through means of an illegal election held by unauthorized officers.    In Patterson v. Barlow, 10 P. F. Smith 54, the aid of the court was asked not to prevent acts contrary to law, but to strike down the only lawful system of election in the city, and thereby to disfranchise all its citizens, for all other election laws had been actually repealed.    We said then it was more than doubtful how far private citizens can call for an injunction beyond their own invaded rights, or ask to restrain a great system of law in its public aspects.    In this case we are called upon not to strike down, but to protect a lawful system, and to prevent intrusion by unlawful authority.    If this ordinance is invalid, as we have seen it is as to the city elections, the taxes of the citizens will be diverted to unlawful uses, the electors will be endangered in the exercise of their lawful franchise, and an officer necessary to the lawful execution of the election law ousted by unlawful usurpation of his functions.

The convention is not a co-ordinate branch of the government. It exercises no governmental power, but is a body raised by law, in aid of the popular desire to discuss and propose amendments, which have no governing force so long as they remain propositions. While it acts within the scope of its delegated powers, it is not amenable for its acts, but when it assumes to legislate, to repeal and displace existing institutions before they are displaced by the adoption of its propositions, it acts without authority, and the citizens injured thereby are entitled, under the declaration of rights, to an *open* court and to redress at our hands.

In conclusion, we regret that the nature of the case requires prompt, instant action, and that the circumstances under which we act demand a written expression of our views.    We gladly would have had more time for discussion among ourselves, and for the preparation of the opinion.    As it is, we have given to the subject all our most anxious thoughts and labor, and have arrived at the best conclusions honest convictions can reach.

And now, December 5th 1873, this case having come on to be heard before the Hon. Isaac G. Gordon, sitting at Nisi Prius, with the aid of the chief justice and all the other judges of the Supreme Court, called in to sit with him as assessors, and having been duly considered by all

[Wells *v*. Bain.]

the said judges, it is now ordered and decreed that a special injunction be issued out of the said court to the said defendants, Edwin H. Fitler, Edward Browning, John P. Verree, Henry S. Hagert and John O. James, commissioners appointed in an ordinance made by the convention to propose amendments to the constitution of this Commonwealth, and done on the 3d day of November last, enjoining and strictly prohibiting them as such commissioners from directing or in any manner controlling an election to be held under the said ordinance in the said city of Philadelphia, on the 16th day of this December, and especially enjoining and prohibiting them from appointing judges and inspectors to hold the said election in the several districts in the said city, and from making a registration of voters and furnishing the list thereof to the election officers; and a special injunction is issued to the said defendants, James Bain, Alexander McCuen and Thomas Locke, commissioners of the said city of Philadelphia, enjoining and prohibiting them from appropriating, using or expending any money or property of the said city in and about preparing for and conducting the election aforesaid, in so far as the said defendants, E. H. Fitler, Edward Browning, John P. Verree, Henry S. Hagert and John O. James, propose to direct and control the said election and to appoint the officers thereof, or otherwise to manage the same. These injunctions to continue until final hearing or further order of the court.