CARTON *v.* SECRETARY OF STATE.

| 151   337|
|j151   416|

CONSTITUTION — GENERAL REVISION — SUBMISSION TO ELECTORS— TIME—AUTHORITY OF LEGISLATURE.

The Constitution of 1850 designates the biennial November election as the election at which a revision of the Constitution proposed by a convention shall be submitted to the people; whence that provision of Act No. 272, Pub. Acts 1907, providing for the constitutional convention of 1907, which directs the submission of their draft at the spring election of 1908, is invalid; per GRANT, C. J., and BLAIR, CARPENTER, and MOORE, JJ., on the ground that the amendment of section 1, article 20, made in 1876, was not intended to change that section in its application to section 2, and that the two sections, construed together, as they stood prior to the amendment, provided for submission as above stated; OSTRANDER, J., concurring in the result, upon the ground that the Constitution implies that a revision must be submitted at a general election, and that only one such, viz., the biennial November election, is fixed by the Constitution; MONTGOMERY, HOOKER, and McALVAY, JJ., dissenting, on the ground that the legislature was within its powers in fixing the date.

151 MICH.—22.

Mandamus by John J. Carton, president of the constitutional convention, to compel George A. Prescott, secretary of State, to submit the proposed Constitution at the November general election. Submitted February 27, 1908; reargued March 5, 1908. (Calendar No. 22,741.) Writ granted March 9, 1908.

*Henry M. Campbell, Victor M. Gore, Frank S. Pratt, Andrew L. Moore,* and *Roger I. Wykes,* for relator.

*John E. Bird,* Attorney General, *Henry E., Chase,* Deputy Attorney General, and *Thomas Ambrose Lawler,* Assistant Attorney General, for respondent.

GRANT, C. J. The people of Michigan in preparing and adopting their first Constitution provided means for a revision or change of the entire Constitution, by authorizing the legislature to recommend to the electors to vote for or against a convention, and, if the electors voted for it, by authorizing the legislature to provide by law for calling such convention to consist of not a less number than both branches of the legislature. Section 2, article 13, Constitution of 1835.

Pursuant to this provision, a convention was called to assemble in 1850. The entire Constitution was revised, submitted as a whole to the people, and adopted. The people again provided for future revisions and changes of the entire Constitution, by requiring the question of a general revision to be submitted to the electors qualified to vote for members of the legislature at the general election of 1866, and every 16th year thereafter, and at other times should the legislature so decide, and if the electors voted for such revision they required the legislature at its next session to "provide by law for the election of such delegates to such convention." Pursuant to this provision, the electors of 1906 voted for a convention, and in 1907 the legislature in obedience to the above mandate of the fundamental law passed an act for the election of dele-

gates to such convention.   (Act No. 272, Pub. Acts 1907.) In that act they provided that the convention should meet October 22, 1907; that they should receive $10 per day as compensation, to cease January 31, 1908, and required the proposed Constitution to be submitted to a vote of the people at the April election of 1908.   The convention did not complete its work until February 21st.   Believing that there would not be sufficient time to publish the instrument and place it in the hands of the electors for their consideration and for an intelligent examination thereof before the April election, the convention provided that the instrument should be submitted at the general election in November, 1908, and required the respondent secretary of State to issue the proper notices for such election.   The respondent, doubting the power of the convention to fix a date other than that provided by the legislature, declined to comply with the order of the convention, and this suit is instituted to obtain a speedy determination of the important question.   The question is, Which body has the power and is charged with the duty to prescribe the time and manner for submission to the electors ?

I will discuss the question upon the assumption that the Constitution contains no express provision upon the subject.   The act of the Territorial legislature, in calling the first convention, made no provision whatever for submitting their proposed Constitution to the people for ratification.   3 Terr. Laws, p. 1356.   Plenary power was therefore inherent in that convention to provide for the time and manner of submission.   It exercised that power. Section 9 of the Schedule, Const. 1835.

The act of 1850 for the election of delegates to the convention provided that "said revision shall be submitted by the convention to the people for their adoption or rejection at such time and in such manner as the convention may prescribe."   Act No. 78, Laws 1350.   The act for the election of delegates to the convention of 1867 contained the same provision.   Act No. 41, Laws 1867.   The act calling the present constitutional convention is the first

attempt on the part of the legislature to fix the time and manner of submission.

It is, in my judgment, of supreme significance that the people made complete provision in their first and second Constitutions for revising or changing their Constitution as a whole. Single amendments might be submitted to a vote of the people by the legislature (art. 20, § 1); but no power to provide for a general revision was ever conferred upon the legislature. On the contrary, it is prohibited. It was the evident and wise desire of the people to keep a general revision within their own exclusive power. They decided to exercise that power, not through their legislature, but through a convention of their own citizens chosen by themselves expressly for that purpose. Questions had arisen in other States whose constitutions contained no provision for a revision or change of the fundamental law, and the difficulties arising in consequence thereof may have been the reason why the framers of our Constitutions determined to place that power beyond question, and reserve it absolutely to the people. The Constitution of 1850 remains the fundamental law of the State until it is changed in the manner provided by that instrument or by revolution. The provisions for amending and revising it are as binding upon the several departments of government as any other provision. After the convention is called into being it is limited in its powers by the existing Constitution which it is bound to observe. The sole power conferred upon the legislature, in regard to changes in the Constitution, is confined to three things: (1) To submit to the people single amendments. Section 1, article 20. (2) To submit to the electors the question whether they desire a general revision of the Constitution. Section 2, article 20. (3) If the electors so desire, to "provide by law for the election of such delegates to such convention." Section 2, article 20.

By necessary implication, the legislature is prohibited from any control over the method of revising the Constitution. The convention is an independent and sovereign

body whose sole power and duty are to prepare and submit to the people a revision of the Constitution, or a new Constitution to take the place of the old one. It is elected by the people, answerable to the people, and its work must be submitted to the people through their electors for approval or disapproval.

The people through their Constitution provided two agencies for such revision. One, the legislature, with an express and limited power, and the other, the constitutional convention, with power unlimited except by the provisions of the present Constitution. By article 4, § 1, " The legislative power is vested in a senate and house of representatives." Nowhere in article 4, entitled, "Legislative Department," is any reference made expressly or impliedly to amendments or revisions of the Constitution. Only by section 2, article 20, has the legislature any power to act upon a revision of the Constitution. The power there conferred is ministerial rather than legislative. But the name is immaterial. It does not require the approval of the governor to make it valid. It is made the sole agency by which the people may determine (1) Whether they desire a revision, and (2) if they decide that they do, to provide for the election of delegates. While it is true that the maxim expressio unius est exclusio alterius is more frequently applied to the construction of contracts and statutes ( *Williams* v. *Mayor, etc., of Detroit*, 2 Mich. 563), it is equally true that the maxim may and should be applied to constitutional provisions in a proper case. The supreme court of Rhode Island applied this maxim in construing the constitution of that State in regard to amending the constitution, and said:

" The ordinary rule is that where power is given to do a thing in a particular way, there the affirmative words, marking out the particular way, prohibit all other ways by implication, so that the particular way is the only way in which the power can be legally executed." *In re the Constitutional Convention*, 14 R. I. 649, 651.

It was contended in that case that the maxim was in-

applicable in the interpretation of a State constitution. I think it is especially applicable here. The power to provide for an election is the sole power conferred. It has been customary for the legislature to provide the time for the convening of the convention, but should this not be done, the members-elect possess the inherent power to assemble and perform the duties imposed upon them. The legislature undoubtedly has the power under section 5 of article 14 of the Constitution ("No money shall be paid out of the treasury except in pursuance of appropriations made by law") to provide for the compensation of its members and the expenses of the convention. The present Constitution has thus provided a disinterested body to fix the compensation of members and the expenses of the convention, for members of the legislature are not eligible to membership. *Fyfe* v. *Kent County Clerk*, 149 Mich. 349.

The Constitution clearly leaves this convention free from, and untrammeled by, any other department of government. The legislature cannot fix the time the convention may continue in session. The legislature evidently recognized this limitation of their power in providing that the members should not receive compensation beyond a certain date. The date of submission is of importance. It is essential that the people should have sufficient time for an intelligent examination of the proposed Constitution in order that they may vote intelligently thereon. This is an important factor in Constitution making. Manifestly the time of submission has nothing whatever to do with providing for the election of delegates. It is fair to presume that the framers of the Constitution and the people in adopting it understood fully that the time the convention may find it necessary to continue its labors was uncertain; that it was essential that there should be ample time between the completion of the proposed Constitution and the election for discussion and consideration, and that therefore the convention itself was the proper body to determine at what election it should be submitted

unless that is fixed in the present Constitution. It put no limitation on its power in this regard. It is necessarily implied in the absence of any other provision, expressly or by necessary implication, placing it elsewhere. It must have been considered as so implied by the Territorial legislature, because it made no provision whatever for submission,—evidently upon the theory that that was one of the duties of the convention.

I find no language in the Constitution from which any implication can arise that this power was vested in the legislature. The learned attorney general cites in support of his contention the case of *Wells* v. *Bain*, 75 Pa. 39. The manifest difference between that case and this is that the constitution of Pennsylvania contained no provision for a general revision of the constitution,—while in ours, as above shown, is made ample provision for such revision, and in Pennsylvania the legislature spoke the convention into existence, and was authorized to prescribe its duties and powers. In this State the people by their vote alone can speak, and in this case did speak, the convention into existence. It was there held that the convention was the offspring of law, and the court said:

" The process was an application or petition to the legislature to call a convention, the passage of a law to gather the sense of the people on the question whether a convention should be called; an election authorized by this law to take the sense of the whole people on this question, and, finally, the passage of a law to call the convention and define its powers and duties."

The law which called that convention into being prescribed that it should be submitted under the general election laws of the State. The convention undertook to set aside those election laws in certain parts of the State, and provide machinery of its own invention. It was held that the provision for submission was a part of the act which called the convention into being, and that its members were estopped to deny the terms under which they

held their seats. That case, in my judgment, is of no authority in this.

The argument is also made that the respondent is clothed only with such power as is conferred upon him by law, and that there is no act of the legislature imposing a duty upon him to act in obedience to the direction of the constitutional convention. This argument "sticks in the bark." As already stated, the power of the convention to fix the time and manner of submission is necessarily implied. It follows that it may make it the duty of some officer of the government to give the notices required. From the foundation of the State government the secretary of State has been recognized by law as the proper officer to give notice of elections. It is as much his duty to obey the mandate in this regard of the constitutional convention as it is to obey a law of the legislature. It is due to him to say that his declination to act is not captious, but was only made for the purpose of a prompt and early decision of the question.

The acts of the legislature in providing for the conventions of 1850 and 1867 authorized the convention to fix the time and manner of submission. If the act of fixing the time was in the sole power of the legislature, it had no authority to delegate it to another. It could as well delegate it to the secretary of State, or to the executive, or to any other State officer, as to the convention. The delegation of that power in those two cases was the recognition of authority vested in the convention to fix it. The legislative power which the legislature may delegate is that provided in section 38, article 4, viz., upon municipal corporations. This power to fix the time of submission, under the contention of the attorney general, must be one necessarily implied. If the power is necessarily implied, it is as binding upon the legislature and as incapable of delegation as though it were express. The Constitution provides that the legislature may, by a two-thirds vote of the members of each house, prescribe the time in which an act shall take effect; otherwise it takes effect 90 days

from the end of the session.  Section 20, article 4.  Could the legislature delegate to the governor the power to determine when an act should take effect?  I assume it will be conceded that that power could not be delegated.  If the legislature alone is clothed with power to determine when the proposed revision of the Constitution shall be submitted to the electors, for the same reason it cannot delegate that authority, and the delegation of the power to former conventions was unlawful.

When we have ascertained where this power is lodged, there alone must it be exercised.  Mr. Cooley, in his work on Constitutional Limitations (7th Ed.), p. 98, says:

" It is established as a general rule that when a constitution gives a general power or enjoins a duty, it also gives by implication every particular power necessary for the exercise of the one or the performance of the other."

Mr. Livingston, in the New York constitutional convention of 1821, on page 199, thus concisely stated the position of the members of the convention, in saying:

" The people are here themselves.  They are present in their delegates.  No restriction limits our proceedings,— we are standing on the foundations of society."

See *Goodrich* v. *Moore,* 2 Minn. 61; *Loomis* v. *Jackson,* 6 W. Va. 708.

The supreme court of Minnesota, after declaring the constitutional convention to be " the highest legislative assembly recognized in law," said:

" It has full control of all its proceedings, and may provide in such manner as it sees fit to perpetuate its records, and although the convention may have been called together by legislative authority, that body has no right to select officers for the convention or otherwise control the transaction of its legitimate business.  *  *  *  The admission of such a right in the legislature would place the convention under its entire control;  *  *  *  it would have less power than a town meeting and be incompetent to perform the objects for which it was convened.  It

would be absurd to suppose a constitutional convention had only such limited authority. * * * It must have plenary power for this and all the incidents thereof. The fact that the convention was assembled by the authority of the legislature renders it in no respect inferior thereto, as it may well be claimed, whether, had the legislature refused to make provision for calling the convention, the people in their sovereign capacity would not have had the right to have taken such measure for confirming the adoption of the constitution as to them seems meet."

The supreme court of appeals of West Virginia held:

"*First.* That a constitutional convention lawfully convened does not derive its powers from the legislature, but from the people.

"*Second.* That the powers of a constitutional convention are in the nature of sovereign powers.

"*Third.* That the legislature can neither limit nor restrict them in the exercise of these powers."

I think some consideration should be accorded the unanimous decision of the convention upon this question. It was a body of representative men. It contained lawyers of learning, ability, and experience. The record shows that they made a careful study and examination of the question and reached their conclusion after mature deliberation. It is certainly not revolutionary, neither is it an arbitrary exercise of power or an encroachment upon any of the rights and prerogatives of any department of the government to exercise a power which every constitutional convention before it had exercised.

Happily the liberties of the people are not endangered by this action on the part of the convention. Neither can a constitutional convention, provided for in the present Constitution, endanger the liberties of the people. It cannot precipitate revolution, except by the peaceful means of the ballot. The conclusions of the convention are purely tentative, and do not affect the existing order of things, unless it shall be ratified by the people, in which case a new organic law simply takes the place of the old organic law. Should the convention attempt to exercise authority not conferred upon it, its action can be restrained the

same as can any other body acting illegally. Neither is it to be presumed that the legislature will attempt a general revision of the Constitution by providing amendments to every section and article of it. For 73 years the people have lived under its two Constitutions, and no attempt at general revision has been made by the legislature by proposing numerous amendments.

I have no criticism to make upon most of the quotations from Jameson on Constitutional Conventions, cited in my Brother HOOKER's opinion. We may fully agree with Mr. Jameson in his statement found in section 483:

"The act of assembly under which a convention meets is its charter."

He further states in the same section:

"Does it claim to be itself above the legislature? Let it show its warrant for a claim so exorbitant, for upon it must rest the burden of proving what contradicts all political analogies, and the first principles of constitutional government. It cannot find that warrant in the mandate of the power by whose fiat it came into being, for, by the hypothesis, that is expressly to the contrary. It cannot find it in claims set up by conventions, and allowed by the people, in the best days of the republic, for, with scarcely an exception, during that happy period, when party conflict had not succeeded in perverting our statesmen into mere politicians, it was universally conceded, that the convention was the child of the law, and, as such, bound to obey literally its requirements."

Aside from his unwarranted statement that "our statesmen had become perverted into mere politicians," we can safely concur that the principle he there lays down is applicable where a constitutional convention obtains its sole charter and power to act from the legislature whose child it is. But that language has no application to the condition in Michigan. The constitutional convention is indeed the child of the law, but of the organic law and not a legislative enactment. In this State the Constitution is the charter of the convention and its sole charter.

The members of a convention are the servants of the people, elected by them and answerable to them.

Mr. Jameson's language applied to constitutions like that of Pennsylvania and California, and perhaps others. In California amendments may be proposed by the legislature, but the constitution expressly clothed the legislature with power to submit the amendments to the people "in such manner and at such time as may be deemed expedient." Possibly his language might apply to a case where a constitution had made no provision for amendment or revision. It is said in *Re Constitutional Convention*, 14 R. I. 653:

"If our constitution had no provision for amendment, then, indeed, a power in the assembly to call a convention or to initiate amendments in some other manner might be implied ex necessitate."

As stated early in this opinion, I have discussed the question upon the assumption that the Constitution has not fixed the time at which the proposed revision must be submitted. This was the question presented to us at the hearing on February 27th.

I conclude, therefore, that, in the absence of any express provision of the Constitution, this power is lodged in the convention, and that the writ should issue.

On the other question, which was afterwards suggested by the court for discussion, and argued March 5th, I concur in the opinion of my Brother BLAIR.

I regret that the necessity of a prompt decision has prevented me from giving the subject the investigation and care I would like, and perhaps presenting my views in better form, but the investigation I have made leads me to the above conclusion.

CARPENTER, J. I agree with Justice HOOKER that under our Constitution the convention has no authority to fix the date for the submission to the people of a revision proposed by it. I agree with him that the authority to fix that date belongs to the legislature unless that date is

fixed by the Constitution itself.    I think, however, that the Constitution does fix that date.

Article 20 as it stood in the Constitution prior to the amendment of 1876, hereinafter referred to, reads as follows:

"AMENDMENT AND REVISION OF THE CONSTITUTION.

"SECTION 1. Any amendment or amendments to this Constitution may be proposed in the senate or house of representatives.    If the same shall be agreed to by two-thirds of the members elected to each house, such amendment or amendments shall be entered on their journals respectively, with the yeas and nays taken thereon; and the same shall be submitted to the electors at the next general election thereafter, and if a majority of electors qualified to vote for members of the legislature, voting thereon, shall ratify and approve such amendment or amendments, the same shall become part of the Constitution.

"SEC. 2. At the general election to be held in the year one thousand eight hundred and sixty-six, and in each sixteenth year thereafter, and also at such other times as the legislature may by law provide, the question of the general revision of the Constitution shall be submitted to the electors qualified to vote for members of the legislature; and in case a majority of the electors so qualified, voting at such election, shall decide in favor of a convention for such purpose, the legislature, at the next session, shall provide by law for the election of such delegates to such convention.    All the amendments shall take effect at the commencement of the year after their adoption."

In my judgment, it becomes important to determine at what time the revision of the Constitution proposed by a convention acting under this article before its amendment should be submitted to a vote of the people.    There is nothing in section 2—the section providing for a revision —to throw light upon this question.    Neither is there anything in that section to indicate that the revised Constitution shall be submitted to the people before its adoption. In saying this, I affirm that the language "all the amendments shall take effect at the commencement of the year after their adoption" does not necessarily import an adop-

tion by the vote of the electors, for this language would apply to an adoption by the convention, if the convention had power to adopt. We all agree, however, that the Constitution framed by a convention must be submitted to a vote of the electors, and that it would be entirely ineffectual if not so submitted. We all agree, too, that only the qualified electors of the State can vote upon the adoption or rejection of that instrument. We all agree, too, I think, that it cannot be adopted unless it receives the vote of a majority of such electors voting thereon. All this we agree is implied. From what source do we draw these implications? I maintain that we draw them, not from the spirit of the times; not from contemporaneous history, but from the accompanying language of section 1. When we look outside of section 2 for implications—and under any theory we must so look—there is no place where we can look so appropriately as to the language of the accompanying section—a part of the same article. And we should not be deterred from so looking because it may be said that we can construe section 1 without looking to section 2. The point is that we cannot construe section 2 without looking to section 1. Moreover, no evidence that we could get from other sources would furnish such satisfactory proof of the implications which we all agree we must draw, and it is much safer as well as more satisfactory to find those implications in the Constitution than outside of it. In my judgment, then, in construing section 2 we must look and we should look to the language of section 1.

The people saw fit in section 1 for the gravest of reasons, viz., to protect their constitutional rights, to place limitations upon the authority of the legislature. They said that the legislature can submit an amendment to the Constitution, not at any time it pleased, but only at a certain stated time, viz., "at the next general election thereafter." (And this meant the next biennial November election provided for in the Constitution. See *West-*

*inghausen* v. *People*, 44 Mich. 265.)   Can it be assumed that the people, who thus limited the power of the legislature in submitting a single amendment to the Constitution, intended that its power in submitting an entirely new Constitution should be unlimited ?   I think not. Constitutions are to be construed, not in accordance with the technical rules applied in construing statutes and contracts, but in accordance with the intent of the people who adopt them.   Would not the people understand that the legislature could exercise no greater authority in submitting an entirely new Constitution than it could in submitting amendments proposed by itself ?   I think we must answer this question in the affirmative.   It is suggested that if we are to speculate as to the intention of the people it may be that they intended that the entire Constitution should be submitted at a time when the electors would have no other subject to consider.   If this had been their thought it is impossible to believe that they would have given to the legislature unlimited authority to determine the date of submission—an authority which would enable the legislature to thwart their supposed intent.   Evidently it was the thought of the people that amendments to the Constitution should be submitted at a time when all the electors of the State were most likely to be assembled.   It was their purpose to afford to each elector the fullest opportunity to take part in deciding such a momentous question, and these considerations would apply with certainly as much force in the adoption of an entirely new Constitution as they would in the making of a single amendment to an old.   It is to be borne in mind that the question in this case must be determined by the implications drawn from the Constitution.   The particular question for our consideration is this:   Does the Constitution fix the date for submitting a revision proposed by the convention, or does it leave to the legislature unlimited authority to fix that date ?   This question is not answered by any express provision of the Constitution.

It must therefore be determined by implication. In determining it I do not think we enter or are required to enter into the realm of speculation. Neither do I think that we are required to look outside of the provisions of the Constitution. For I think, as already indicated, that it is determined by the Constitution. The question presented is a strictly legal question. It relates to the construction of the Constitution. It should be determined by a legitimate construction of the Constitution. I have endeavored to so determine it. I have endeavored to construe that instrument in accordance with the intention of the people therein manifested—and no one will deny that it should be so construed—and acting pursuant to that endeavor I reach the conclusion heretofore indicated, viz., that as the Constitution stood prior to 1876 a revision thereof proposed by a convention must be submitted to a vote of the electors at a biennial November election. What biennial November election? Clearly, it was not a biennial November election that might occur more than two years thereafter. It was the next biennial November election.

In 1876, section 1 of article 20 was amended. Section 2 was not amended. Section 1, as amended, reads as follows:

"SECTION 1. Any amendment or amendments to this Constitution may be proposed in the senate or house of representatives. If the same shall be agreed to by two-thirds of the members elected to each house, such amendment or amendments shall be entered on the journals respectively, with the yeas and nays taken thereon, and the same shall be submitted to the electors at the next spring or autumn election thereafter, as the legislature shall direct; and if a majority of electors qualified to vote for members of the legislature, voting thereon, shall ratify and approve such amendment or amendments, the same shall become part of the Constitution."

It will be perceived that the only change made is to substitute for the words " at the next general election thereafter " this clause: "At the next spring or autumn elec-

tion thereafter as the legislature shall direct." Before 1876 the legislature had no authority to determine when amendments proposed by itself should be submitted; that was fixed by the Constitution. That instrument required such amendments to be submitted at the biennial November election occurring in the even year. After 1876 the legislature had the option to determine whether such amendments should be submitted at said biennial November election or at a certain spring election. *Seneca Mining Co.* v. *Secretary of State*, 82 Mich. 573 (9 L. R. A. 770). The change in section 1 made in 1876—and in making this statement I refer both to its language and to its purpose—gave to the legislature the authority—an authority most limited—to determine when amendments proposed by itself should be submitted. This was the grant of an authority to the legislature which it had not theretofore possessed. It applied only to amendments proposed by itself. Does this amendment, made for this purpose, change the time at which the revised Constitution proposed by a convention shall be submitted? That depends upon the intention of the people. In giving to the legislature authority to determine when amendments proposed by itself should be submitted, did the people intend to change the time for submitting a revised Constitution proposed by a convention? It was certainly competent for the people to grant to the legislature this authority over amendments proposed by itself without changing the time of submitting a revised Constitution proposed by a convention. Notwithstanding the fact that in construing section 2 we look at the language of section 1, the people could amend section 1 without changing section 2. For the purpose of ascertaining what section 2 meant at the time of its adoption we should look at the language of section 1 as it was before it was amended in 1876. And section 2 is to be construed as it was before the amendment was made, unless it was the intent of the people when making the amendment in 1876 that its construction should be changed.

151 MICH.—23.

The question, then, I repeat, is this: Did the people, in granting to the legislature authority to determine when to submit amendments proposed by itself, intend to change the time for submitting a revised Constitution proposed by a convention? In answering this question, it should be borne in mind that this opinion proceeds upon the assumption that, prior to the amendment, the Constitution required a revision proposed by a convention to be submitted at the next biennial November election. In other words, I assume that prior to the amendment the legislature had no authority to fix any date for the submission of a revised Constitution. The question presented then is *not* whether the people by *enlarging* the authority of the legislature respecting amendments proposed by itself has also *enlarged* its authority respecting a revision proposed by the convention.' That, I say, is not the question. This is the question: Did the people, in granting to the legislature an authority it did not theretofore possess respecting amendments proposed by itself, intend also to grant it authority, not theretofore possessed, respecting a revision proposed by a convention? In deciding to grant the legislature authority to determine when amendments proposed by itself should be submitted, the electors had no occasion to consider when a proposed revision of the Constitution should be submitted. That was a very different question from the one they were called upon to consider. That was a subject not brought to their attention by the proposed amendment to section 1. That was a subject which depended upon a proper construction of section 2. It is impossible to believe that they had this subject in mind. The only ground then upon which it can be held that they did change the time for submitting a revised Constitution proposed by a convention is that we cannot give effect to the change they made without so holding. But this cannot be said. They still left the general biennial November election as the principal election prescribed by the Constitution and at that election the revised Constitution can be submitted. To hold that the amendment

of 1876 has changed the time for submitting a Constitution proposed by a convention is, in my judgment, to hold that the people have made a change in their fundamental law which they did not intend to make. Certainly we cannot so hold. I am, therefore, of the opinion that since the amendment of 1876, as before, a revised Constitution proposed by a convention must be submitted at the next succeeding biennial November election.

It is said that this reasoning would not be applicable had section 2 provided in express terms that the revision should be submitted at the election mentioned in the preceding section 1. It is said that had such been the case the effect of the amendment made in 1876 would give the legislature the same authority to submit the revision proposed by the convention that it has to submit amendments proposed by itself. The case supposed does not differ from the actual case, and it would present precisely the same question, viz., Did the people, in granting to the legislature an authority it did not theretofore possess respecting amendments proposed by itself, intend also to grant authority not theretofore possessed respecting a revision proposed by a convention? And I should, of course, answer this question in the negative by the same process of reasoning heretofore advanced in this opinion.

It is also said that in deciding that the amendment to section 1 made in 1876 does not change the time for submitting the Constitution revised by the convention under section 2, we disregard the rule of law relating to the construction of statutes in pari materia. I am not sure that this is true; possibly it is. If so, I reply that in construing constitutions technical rules applied in construing statutes are disregarded when they lead to a conclusion obviously opposed to the intention—an intention manifested in the Constitution—of the people who adopted the Constitution. *Williams* v. *Mayor, etc., of Detroit*, 2 Mich. 563; Cooley on Constitutional Limitations (7th Ed.), p. 123. For the reasons heretofore stated, I am of the opinion that the people, in granting to the legislature

authority to determine within a very limited range when amendments proposed by itself should be submitted, did not intend to change the time when a revised Constitution proposed by a convention should be submitted. Holding that opinion, no reasoning drawn from the principles applicable to the construction of statutes will justify me in deciding that the amendment of 1876 changed the time for submitting a revised Constitution proposed by the convention. For that would compel me to thwart the people's will. It would compel me to disregard the most fundamental of all principles of constitutional construction, and place upon the Constitution a construction opposed to the intention of the people who adopted it.

It is argued that the reasoning of this opinion in support of the proposition that the amendment made to section 1 in 1876 does not change the time for submitting a Constitution revised by the convention under section 2 is opposed to the proposition that the time originally specified in section 1 for submitting amendments proposed by the legislature is also the time for submitting the revised Constitution proposed by the convention. The source from which this argument emanates had led me to reconsider with such care as the limited time permits the reasoning of this opinion. I can only say that this has not resulted in a change of my views or of my reasoning. In short, I am forced to reject the argument. But after all, the important question relates not so much to the correctness of the reasoning of this opinion as to the correctness of its conclusions. This opinion maintains two propositions. While I have endeavored to show that these two propositions are consistent, the success or failure of that endeavor is of no particular importance. Are they consistent? That is a question of far greater importance. Is it consistent to say that the people in adopting section 2 many years ago intended that the revised Constitution therein referred to should be submitted at the November biennial election specified in the prior section, and at the same time to deny that they intended to change this time

by so amending section 1 as to give the legislature the right, under certain conditions, of submitting amendments proposed by it at a spring election? I maintain that it is. We determine the first question by ascertaining the intention of the people at the time they adopted section 2 relating to the revised Constitution. This intention is to be given effect today in construing the Constitution, unless the people have subsequently expressed a contrary intention. Have they expressed a contrary intention? That depends upon their intention in making the amendment in 1876, and it clearly presents a very different question from the one involved in determining that in adopting section 2 many years before they intended that the Constitution revised by the convention should be submitted at the biennial November election specified in the prior section. It seems to me therefore entirely consistent to say that the people in adopting section 2 intended that the revised Constitution therein referred to should be submitted at the biennial November election specified in the prior section, and that they did not intend to change this time by the amendment made to section 1 in 1876.

The revised Constitution under consideration must therefore in my judgment be submitted to the electors of the State at the general election to be held in November, 1908.

I cannot say that I am absolutely sure of the correctness of the conclusions reached in this opinion or of the reasoning contained therein. Several of my associates who have given this question the most careful and thoughtful attention, and for whose judgment I entertain the highest regard, have reached a contrary conclusion. I cannot say that this circumstance has had no effect upon my mind. It should have and has had a tendency to lessen the confidence which I might otherwise have in my opinion; in its conclusion and in its reasoning, but, nevertheless, I am bound to say that that confidence, though impaired, is very far from being destroyed, and I cannot abandon my views without basely surrendering my convictions

—convictions reached as a result of all the research and deliberation permitted by the limited time which we have had for the consideration of this case. I am therefore required by the mandate of duty to sign and file this opinion.

MOORE, J., concurred with CARPENTER, J.

BLAIR, J. Article 20 of the Constitution of 1850 prescribes the method for "amendment and revision of the Constitution," and it can only be amended or revised in the method there prescribed.

Section 1 as amended in 1876 provides for the proposing of amendments by the legislature as follows:

"SECTION 1. Any amendment or amendments to this Constitution may be proposed in the senate or house of representatives. If the same shall be agreed to by two-thirds of the members elected to each house, such amendment or amendments shall be entered on the journals respectively, with the yeas and nays taken thereon, and the same shall be submitted to the electors at the next spring or autumn election thereafter, as the legislature shall direct; and if a majority of electors qualified to vote for members of the legislature, voting thereon, shall ratify and approve such amendment or amendments, the same shall become part of the Constitution."

Prior to the amendment of 1876, this section required the proposed amendments to be submitted "at the next general election thereafter," and it was held by this court that as the only general election known to the Constitution was the November election, constitutional amendments proposed by the legislature must be submitted at the biennial November election. *Westinghausen* v. *People*, 44 Mich. 265.

It was said in that case:

"It will be seen from all this that under the Constitution there was only one election which was ever referred to as a general election, and that the term was used as identical with the November election, which was previously annual, and thereby made biennial. That was

the only election held simultaneously throughout all the State for officers to represent the whole State. At that election the governor and all the State officers throughout all the State, and the senators and representatives in the State legislature, except in the Upper Peninsula, were chosen. The only other elections referred to were the annual town meetings, and the sexennial circuit elections for circuit judges and regents, in which the Upper Peninsula was separated from the rest of the State for judicial purposes, and attached to Wayne county for the election of a regent for the third circuit. It is also worthy of remark that under the old Constitution ( article 13) amendments might be submitted to vote at any time and in any manner determined by the legislature. The change, therefore, cannot be regarded as accidental or without meaning, and the general election contemplated was regarded as important. And it appears from the Convention Debates not only that an attempt was made to leave the time and manner of voting for the legislature to fix, but also that it was understood no amendment could be voted on under the Constitution as it stands except at the November election to be held biennially. Convention Debates, 466, 467. No amendment of the Constitution has been made which denominates any other election in the same way. We have no means of knowing what were the reasons which led the several members of the constitutional convention to prefer a submission at the fall election. It may be presumed it was an idea, which facts have always warranted, that more votes are cast at that election than at other times. And when the Constitution went into operation there was no other election held annually or biennially in all of the cities."

The authority of the legislature under this section was considered in *Murphy Chair Co.* v. *Attorney General*, 148 Mich. 563, where it was held that in providing for the submission of constitutional amendments the legislature "is exercising a constitutional function which cannot be restricted by any previous legislation."

Section 2 of article 20 provides for a revision of the Constitution and reads as follows:

" SECTION 2. At the general election to be held in the year one thousand eight hundred and sixty-six, and in each sixteenth year thereafter, and also at such other

times as the legislature may by law provide, the question of the general revision of the Constitution shall be submitted to the electors qualified to vote for members of the legislature, and in case a majority of the electors so qualified voting at such election, shall decide in favor of a convention for such purpose, the legislature, at the next session, shall provide by law for the election of such delegates to such convention. All the amendments shall take effect at the commencement of the year after their adoption."

Prior to the adoption of the amendment proposed in 1861 the word "year" in the last line was preceded by the word "political."

This subject is covered in the Constitution of 1835 by sections 1 and 2 of article 13, reading as follows, viz.:

"1. Any amendment or amendments to this Constitution may be proposed in the senate or house of representatives; and if the same shall be agreed to by a majority of the members elected to each of the two houses, such proposed amendment or amendments shall be entered on their journals, with the yeas and nays taken thereon, and referred to the legislature then next to be chosen; and shall be published for three months previous to the time of making such choice; and if in the legislature next chosen as aforesaid, such proposed [amendment or] amendments shall be agreed to by two-thirds of all the members elected to each house, then it shall be the duty of the legislature to submit such proposed amendment or amendments to the people, in such manner and at such time as the legislature shall prescribe; and if the people shall approve and ratify such amendment or amendments, by a majority of the electors qualified to vote for members of the legislature voting thereon, such amendment or amendments shall become part of the Constitution.

"2. And if at any time two-thirds of the senate and house of representatives shall think it necessary to revise or change this entire Constitution, they shall recommend to the electors at the next election for members of the legislature, to vote for or against a convention; and if it shall appear that a majority of the electors voting at such election have voted in favor of calling a convention, the legislature shall at its next session provide by law for calling a convention, to be holden within six months after

the passage of such law; and such convention shall consist of a number of members not less than that of both branches of the legislature."

The debates of the constitutional convention of 1850 afford some assistance in interpreting the provisions of article 20. The Constitution of 1835 authorized the submission of constitutional amendments at such times and in such manner as the legislature might determine. When article 20 was before the constitutional convention of 1850, an amendment was proposed to section 1, conferring upon the legislature the same power which it possessed under the Constitution of 1835. This amendment, however, was defeated. Constitutional Debates of 1850, page 465.

When section 2 of the same article was under consideration, another significant change, indicating the same intention, was made. The section read—"at the general election to be held in the year one thousand eight hundred sixty-five, and in each fifteenth year thereafter," etc., the question of a general revision shall be submitted to the electors. Attention was called to the fact that in 1865 there would be no election. Mr. Pierce moved an amendment changing the date to 1866 and changing the word "fifteenth" to "sixteenth," in order that the submission might be had at the time of the regular biennial election. This amendment was adopted and the section passed in its present form. Constitutional Debates 1850, page 467.

A brief history of the article is given in *Seneca Mining Co.* v. *Secretary of State*, 82 Mich. 573 (9 L. R. A. 770), where the time of taking effect of constitutional amendments was under consideration. It was held in that case that, since the amendment of 1876, at least, amendments under section 1 took effect from the time of their ratification by the popular vote. It would seem that the decision of the court must rest upon one of the following grounds:

1. The concluding clause of section 2, "All the amendments shall take effect at the commencement of

the year after their adoption," has reference solely to the amendments specified in section 1.

2. The concluding clause of section 2 refers both to amendments proposed by the legislature under section 1 and amendments adopted by the constitutional convention under section 2.

3. The concluding clause of section 2 refers solely to amendments proposed by the constitutional convention.

The adoption of either the first or second construction would involve the further holding that the effect of the amendment of section 1 in 1876, substituting for the word "general" before the word "election" the words "spring or autumn election thereafter as the legislature shall direct," was to annul the concluding clause of section 2 and practically eliminate it from the article. While there is language in the opinion which lends support to the conclusion that the court adopted the first construction, the opinion does not expressly adopt it and could not, it seems to me, logically adopt it. There is no inconsistency whatever between the last clause of section 2 and section 1, as amended, and such clause could as well stand after the amendment as before.

Section 1 of article 20 of the Constitution of 1850 uses substantially the same language as section 1 of article 13 of the Constitution of 1835, in fixing the time when the amendments specified in the section should take effect, viz., immediately upon their ratification by popular vote the same "shall become part of the Constitution."

There can be no question that, under the Constitution of 1835, the amendments proposed under section 1 did take effect at once upon their ratification by the people. It seems reasonable to suppose that the convention of 1850, in using the language of the Constitution of 1835, intended that it should have the same effect.

There was no provision, however, in section 2 of the Constitution of 1835, fixing the time when the amendments proposed by the convention should take effect, and the convention of 1850, among other changes in that section, provided, at the end of the section, that "all the

amendments shall take effect at the commencement of the year after their adoption." Section 2 was radically changed by the convention of 1850. They made it over as they wanted it, just as they altered section 1 to meet their views, and there is no valid reason for saying that the provision which they inserted in section 2 belonged in section 1.

If the concluding clause of section 2 applies solely to the amendments proposed by the convention, the purpose which the court found actuated the legislature in proposing the amendment was effectuated, viz., to obtain a vote, if desired, while the legislature was still in session and could take action under amendments which were ratified, which could not theretofore have been ratified until after the end of the session. And the amendment took effect from its ratification because of the provision of section 1 that upon their approval by popular vote " the same shall become part of the Constitution."

The language of the court in *Westinghausen* v. *People*, supra, indicates the same conclusion. In discussing section 10 of the schedule providing for the submission of the revised Constitution of 1850, Justice CAMPBELL says, referring, as I think clearly appears, to the amendments proposed by the convention: " By section 2 of article 20 the amendments were made to take effect at the beginning of the next year."

I think, therefore, that the decision of the court must rest upon the ground that the concluding clause of section 2 has no reference to the amendments specified in section 1 but applies, and from the beginning has applied, solely to the amendments proposed by the convention provided for in section 2.

If it be contended that the court held that the concluding clause of section 2 had reference solely to the amendments specified in section 1, that section would then provide, in effect, prior to the amendment of 1876, that amendments "shall be submitted to the electors at the next general election thereafter; and if a majority of

electors qualified to vote for members of the legislature voting thereon shall ratify and approve such amendment or amendments, the same shall become part of the Constitution but *shall take effect at the commencement of the year after their adoption.*" It is said in *Seneca Mining Co.* v. *Secretary of State*, 82 Mich., at page 579 (9 L. R. A. 770):

"Whatever interpretation may have been given this article by the legislature, or others acting under it, prior to the amendment of 1875, which was ratified by the electors, so that the vote of the electors upon amendments could be taken at the spring election, or in the autumn, it is very evident that it was the intention of the legislature of 1875 so to change the time when the amendments should take effect that legislation could at once be had under the change so made in the Constitution. If the time of the taking effect of these amendments was still postponed until the commencement of the year following, then the submission of such amendments to the electors for their approval might as well have been at the general election as in the spring, and nothing would have been gained by a submission at an earlier period. It is quite apparent that the very purpose, and the only object, to be accomplished by this change in section 1, was to enable the legislature, during its sitting, to enact laws to meet the object sought to be accomplished by a change in the fundamental law; that the legislature might submit an amendment or amendments to the Constitution at the spring election, and, if ratified by the electors, the legislature being then in session could, by appropriate legislation, carry out the object sought in the change. It must be held that the amendment took effect from the time of the ratification by the popular vote."

I am at a loss to understand whence this very clear intent is derived, under the assumed interpretation. The amendment left, in the article, and, practically, in the section, the clear and unambiguous statement that all amendments, including the very one proposed, should not take effect at once but only at the commencement of the year after their adoption. There was no inconsistency between those words and the amendment. The electors

would naturally understand that the only purpose of the amendment was to give to the legislature an option to submit proposed amendments either at the general autumn election as theretofore or at the general spring election.   They certainly could not have understood that the amendment contemplated repealing or annulling a provision of the article in harmony with the proposed amendment.   If the prominent idea in the mind of the legislature was to do away with the effect of the clause as to the taking effect of amendments, it is singular that they should have left it intact in the article, affirming in the most positive way that all amendments should take effect at the commencement of the year.   That the electors of the State should have recognized an intent to annul the clause would have been little short of miraculous.

In my judgment, there is no necessity here for consulting the history of the times or inquiring as to contemporaneous construction to determine the effect of the amendment of 1876.   The language used is unambiguous, the article as amended is harmonious and consistent throughout, and could only have been understood by the electors as in harmony with the remainder of the article.   Whatever may have been the undisclosed intention of the legislature, the plain intention of the people, as disclosed by the language adopted, must prevail.

I think, therefore, that the result reached in the abovementioned case must rest upon the ground that the concluding clause of section 2, which was deliberately added to section 2 and not to section 1 by the constitutional convention of 1850, was intended to apply to and does apply solely to section 2, and that the intention of the legislature proposing, and of the people adopting, the amendment was to enable the legislature to submit an amendment at an earlier date than the autumn election, when, being still in session, it could enact legislation to put the ratified amendment into effect.

It follows that the provisions of section 1 for submitting proposed amendments to the electors have no direct

application to the amendments proposed by the convention under section 2, and there is no express provision for such submission in the Constitution. I think, however, the concluding clause of section 2 implies that the amendments are to be submitted to the people for their approval, and that without such clause, by implication of law such submission would be necessary.

The important questions arise next: When and by whom shall the convention amendments be submitted?

Until the amendment of 1876, all amendments proposed by the legislature had to be submitted at the November election. As remarked by Justice CAMPBELL in *Westinghausen* v. *People*, supra, this was an important change from the provision of the Constitution of 1835 whereby the legislature could submit such amendments at any time and in any manner they thought best.

Whatever view may be taken of the ground or effect of the decision in *Seneca Mining Co.* v. *Secretary of State*, the result must be the same, so far as it affects the time for submitting the amendments specified in section 1, viz., by the amendment adopted by the people in 1876, the legislature was authorized to submit a constitutional amendment at the spring election of the year when it was in session or at the general fall election, and was limited in its choice to one of the two prescribed elections as theretofore it was limited to the November election. If the opinion of the court is correct, as I believe it to be, in stating that "the very purpose, and the only object, to be accomplished by this change in section 1, was to enable the legislature, during its sitting, to enact laws to meet the object sought to be accomplished by a change in the fundamental law;" then it necessarily follows that the spring election designated in the amendment of 1876 is the general State-wide spring election occurring in odd years, and the legislature has no authority to submit an amendment under section 1 at any other elections.

The reasons stated in *Westinghausen* v. *People* for the selection of the November election would apply with

still greater force to the submission of a general revision of the Constitution.

Section 2 has remained practically unchanged since its adoption in 1850, and its meaning now is to be determined by ascertaining its meaning then.  While then, as now, no provision appears specifying the time when the revision shall be submitted to the people for ratification, I understand that we are all of the opinion that such submission is necessarily implied.  Assuming this implication to be well founded, it appears to me to follow that the revision must be submitted, either, (1) at some general election already provided for, or, (2) at such time as the legislature or the convention may see fit to fix.  In either event the time for submission is arrived at by inference or implication, and the question is, Which implication is the more reasonable ?  As to the submission of the question whether there shall be a revision, we are not left in doubt. The section itself requires that that question shall be submitted at the general biennial fall election.  The debates above referred to indicate the importance which the convention attributed to fixing upon this as the time for submission, as they indicate the importance attributed to the change requiring amendments under section 1 to be submitted at the same general State-wide election.

The members of the legislature also would be elected at this same election in November of the even years, under the provisions of section 34 of article 4 of the Constitution. Their first meeting would occur on the first Wednesday in January of the ensuing odd years, under section 33 of article 4.  Amendments proposed under section 1 of article 20 and ratified at the November election would take effect at once, and a constitutional revision ratified at the November election would take effect the first day of the month in which the legislature was required to meet.

The constitutional convention of 1850, whose ratified revision we are now considering, provided :

" This Constitution shall be submitted to the people for their adoption or rejection at the general election to be held on the first Tuesday of November, one thousand eight hundred and fifty." Schedule, § 16.

Starting with the implication that the revision must be submitted to the people at some election where every qualified elector would have an opportunity to vote, the inference seems to me to be irresistible that such election, in the view of the Constitution, was the general November election, and that alone.

It does not appear credible to me to suppose that the convention of 1850 deliberately changed the provisions of the Constitution of 1835 so as to limit the submission of legislative amendments to the general fall election; limited the submission of the question, whether there should be a revision, to the same general election; and then left it to the legislature or the convention to appoint an election to pass upon the revision at any time it saw fit. Manifestly, a revision involving the whole Constitution would require as careful consideration and, at least, as favorable an occasion for the expression of the popular will as a single amendment proposed by the legislature. And to determine whether a revised Constitution shall be adopted is certainly as important as to determine whether there shall be some kind of a revision for consideration.

If, as I have endeavored to show, the amendment of 1876 had no effect upon section 2, then it follows, in my opinion, that convention amendments can only be submitted by the legislature, if at all, at the general November election, adopted by the Constitution prior to 1876 for all elections held under the provisions of article 20.

In my view, therefore, it is of little practical importance where the authority is reposed to order the submission to popular vote, since, whether it rests with the convention or the legislature, either body must submit it at the coming November election.

If the time for submitting the proposed revision of the Constitution under section 2 must be regarded as open,

then I concur in the opinion of Chief Justice GRANT that the fixing of that time devolves upon the constitutional convention, which alone can properly determine that time. The Constitution has certainly committed to the patriotic and enlightened judgment of the convention the determination of the duration of its session, and this, I think, involves, by necessary implication, the right to fix the time for submitting its revision of the Constitution. Furthermore, it must not be overlooked that article 20 of the present Constitution was framed by a constitutional convention and not by a legislature; that the scheme of amendment divides proposed amendments into two ,classes, giving one section to each class; that, by the first section, the constitutional convention carefully limited the authority of future legislatures; that, by the second section, the constitutional convention did not limit the authority of future constitutional conventions.

Under such circumstances, it seems to me to be illogical to hold that the convention which limited the authority of the legislature as to its class of amendments intended to and did commit to the legislature power to limit the authority of conventions which it had deliberately left unlimited. In my judgment, the postulate, that authority to fix the time of submission—if it is not fixed by the Constitution—is committed to the convention, flows logically from the premises. This has been the opinion of the legislatures and conventions for the past half century, and I see no imperative reason for departing from it now.

OSTRANDER, J. Practically, the question now submitted to this court is of little moment. The proposed revision of the Constitution will be voted upon, at some time. To say, however, that the question presented is, from a legal standpoint, free from difficulty, would be a reflection, manifestly undeserved, upon the reasoning employed by the convention, by counsel, and by the members of this court, in the attempt to make a reasonable—legally

reasonable—answer to the question.   My own reasons for thinking that the writ applied for should be granted, not because the convention had power to fix the election day but because it is fixed by the existing Constitution, may be stated in few words.   We are agreed, and this in the absence of express constitutional sanction, that the revised Constitution must be submitted to and be adopted by the electors before it can become law.   We are agreed, and this, also, without express constitutional sanction, that the election held for this purpose should be a State-wide election—a general election.   If, in addition, we can find a general election fixed by the Constitution, we should also agree, I think, that the constitutional general election day is the day for submitting the revision to the people; we should make the assumptions, or implications, stated, agree with the constitutional provisions for a general election.   This because in the very subject-matter, and in the express provisions found in article 20 of the Constitution, there are limitations upon the general legislative powers elsewhere delegated to the senate and house of representatives.   A more correct statement would be that there are prohibitions of legislative action.   In any event, we are are not permitted to support an exercise of power with respect to a revision of the Constitution upon the premise of the general, constitutional delegation of that power or upon a supposed necessity for its exercise, if in the Constitution itself the thing inquired about is found. Without reciting its various provisions, I find one, and but one, general election fixed by the present Constitution. That is the biennial November election.   It is true that one of the election days fixed by the legislature, and one necessarily general, is recognized in the Constitution, article 13, section 6, and the Constitution fixes, also, the election day for circuit judges.   But the " general election " in this State is the one held each two years, in November.   If any one should be of opinion that the spring elections, in the odd years, may be called constitutional general elections, it does not aid the respondent.

It is not satisfactory, it may be dangerous, to rest judicial decision upon intention or supposed necessity where the supposed intention is not clearly indicated by the words employed in a statute or a Constitution and where the necessity is not evident. We have in the present matter two necessary implications, indulged by every one. Beyond these we have an organized, constitutional government, a part of which is a fixed, constitutional, general election, with machinery adapted to the purpose to be here conserved. Beyond the direction to the legislature to provide for a convention, if one shall be ordered by the people voting at "the general election," section 2 of article 20 of the Constitution is silent. The legislature has assumed that something is omitted and that the general delegation of legislative power permits or requires it to supply the omission. I do not find that anything is omitted. The convention has acted and has submitted its report. In my judgment, it would be the duty of the proper officers, to the performance of which they could be compelled, to submit the proposed new Constitution at the next general election.

HOOKER, J. This cause arises out of a conflict of authority between two constitutional representative bodies with delegated powers. It is before us on an application for a mandamus to compel the secretary of State to take the necessary steps to submit to the electors, at the next November election, the proposed Constitution, prepared by the existing constitutional convention, and filed in his office, by its direction, in compliance with Act No. 272 of the Public Acts of 1907,—being the act under which the delegates to said convention were elected,—instead of at the spring election, as he is required to do by the provisions of the act referred to. The application is filed by the president of the convention. The Constitution of this State prescribes two methods of making amendments to that instrument.

"ARTICLE 20. Any amendment or amendments to this

Constitution may be proposed in the senate or house of representatives. If the same shall be agreed to by two-thirds of the members elected to each house, such amendment or amendments shall be entered on the journals respectively, with the yeas and nays taken thereon, and the same shall be submitted to the electors at the next spring or autumn election thereafter, as the legislature shall direct; and if a majority of electors qualified to vote for members of the legislature, voting thereon, shall ratify and approve such amendment or amendments, the same shall become part of the Constitution.

"At the general election to be held in the year one thousand eight hundred and sixty-six, and in each sixteenth year thereafter, and also at such other times as the legislature may by law provide, the question of the general revision of the Constitution shall be submitted to the electors qualified to vote for members of the legislature, and in case a majority of the electors so qualified voting at such election, shall decide in favor of a convention for such purpose, the legislature, at the next session, shall provide by law for the election of such delegates to such convention. All the amendments shall take effect at the commencement of the year after their adoption."

The "question of the general revision of the Constitution" was submitted to vote at a special election held on April 6, 1906, under the provisions of Act No. 325, Pub. Acts 1905, when the proposition to call a convention was carried. At its general session in 1907, the legislature provided for the election of delegates to such a convention by Act No. 272, Pub. Acts 1907. Section 8 provides:

"After the convention shall have approved the draft of the proposed new Constitution, the same shall be printed in the same manner as acts of the legislature for presentation to the governor, shall be signed by the president and secretary, and, when so signed, shall be deposited in the office of the secretary of State, and shall be deemed the official copy of the proposed Constitution as adopted by the convention. The revised Constitution shall be submitted by the convention to the people for adoption or rejection as a whole, on the first Monday in April, nineteen hundred eight."

The tenth section of the schedule in the proposed Constitution provides:

" This Constitution shall be submitted to the people for their adoption or rejection at the general election to be held on the Tuesday after the first Monday of November, nineteen hundred eight, and it shall be the duty of the secretary of State to forthwith give notice of such submission to the sheriffs of the several counties, and it shall also be the duty of the secretary of State, and all other officers required to give or publish any notice in regard to said election, to give notice as provided by law in case of an election for governor, that this Constitution will be duly submitted to the electors at said election."

The contention of the relator is, in substance, that the legislature has attempted an act not within its power, viz., to fix the time of the submission of the proposed Constitution to vote by the people, and he asserts that such is one of the subjects within the power of the convention. This assertion we understand does not rest upon any express declaration, either constitutional or legislative, that such power be conferred upon the convention, but upon the proposition that the convention, when organized, becomes a body strictly representative of the sovereign,—i. e., the electors in the aggregate,— that it acts for the sovereign, and in its name, and has become possessed by its (the sovereign's) authority of all the powers inherent in the sovereign, which the sovereign could have exercised had it—the people—been assembled en masse.

Constitutional conventions and legislatures are creatures of the people. Their origin is to be sought in the action of the people, when they adopted the first Constitution, and, so far as the late convention and the present legislature are concerned, their existence and the extent of their respective authority is limited by, if not based upon, the Constitution of 1850, now in force.

Whatever speculation we may indulge in regarding other conventions, revolutionary or otherwise, we must find that when that Constitution was ratified, it contained provisions adopted and intended to permit a lawful and orderly change of fundamental law, and it assigned to the

proper departments of government and conventions, pro-
vided for therein, certain functions, in relation thereto,
reserving to the people the question of adoption or rejec-
tion of the proposed amendment.

In a broad sense the change in the fundamental law is
a legislative act, as clearly as changing the municipal law
is. It is none the less so because the people have with-
held from the legislature, so called, the power to legislate
upon, that is in the sense of changing, the fundamental
law, and this is the more apparent when we consider that
what is fundamental law today may not be tomorrow,
and vice versa, so that a subject may be within the con-
trol of the legislature today and not tomorrow.

It is true, as said, that the people, through their Con-
stitution, have provided for a constitutional convention.
Doubtless they might have given to that body unques-
tioned legislative powers, even over the fundamental law,
i. e., authority to change and put in operation a new Con-
stitution. No one understands that they have done this,
and it would seem to follow that it has not the full,
sovereign powers, alleged to have been transferred from
the people to it, even if the powers conferred are really
legislative in character, for the people have reserved to
themselves the right and duty of determining whether a
change is to be made in the Constitution, i. e., to finally
legislate regarding the fundamental law, and it is ques-
tionable if they have intended to confer any legislative
powers whatever upon the convention, unless the mere
preparation of a Constitution is to be called a legislative
act, and if it is, the delegated power must end with that
function, including, perhaps, some authority to do the
things that are necessary to that end which may be im-
plied. Article 20 of the Constitution is entitled "Amend-
ment and Revision of the Constitution."

By section 1, the legislature is given the initiative in
amending the Constitution, and it may, unaided by any
convention or other body or officer,—even the governor,—
cause one or any number of amendments, that it may for-

mulate, to be submitted to the electors for adoption. It may practically make a new Constitution in this way.

Again, under section 2, the legislature is given the initiative as to revision, for while it is directed to submit the question of general revision to the electors periodically, it is also given authority to do so whenever and so often as it may deem best. In either case, if the people shall approve the proposal to have a convention to revise the Constitution, the legislature must provide by *law* for the election of delegates to such convention. It is strenuously argued that providing for the election of delegates is the extent of the power of the legislature, but is that so? Should it leave the elected delegates to determine the time when, and the place where, they shall assemble, the length of time they will devote to the subject, and their compensation and the number and authority of their employés? Are they a law unto themselves as to the method of doing business, at liberty to declare a small minority a quorum, to determine what disposition they will make of their product, how much information regarding it they will give to the public, prescribe how the vote may be taken and canvassed, dispense with existing or establish new boards of registration and canvassers, abolish present, and provide for new, methods of voting, and provide new officers, or prescribe new duties for old ones in relation to the election? This present convention has attempted none of these things, so far as appears upon this record, except the change in the time of submission of the Constitution to the electors.

Is it not more reasonable to say that under section 2 the sovereign body has determined upon and provided for a general inquiry into the fitness of its present Constitution to the present needs, with a view to the suggesting of such changes as shall be found necessary, in the opinion of the convention, and even if we treat the preliminary vote of the people as a declaration of a tentative opinion that changes are necessary and should be made, is the duty and authority imposed and conferred upon the con-

vention anything more than that of reviewing the Constitution and proposing for adoption or rejection, by the people, a revised Constitution which shall contain such changes as it has to recommend, rather than to conclude that it was designed to treat the convention as a superior legislative body, for other purposes, as well as that of reviewing the old and proposing a new Constitution?

Has not relator gone too far in assuming that upon the convention rests the responsibility of changing the date fixed by the legislature for the election, after performing its mission of proposing a Constitution for action by the people?

We understand that all legislative power, other than that reserved to the people, or conferred upon other bodies or officers (if there be such), is confided to the senate and house of representatives. See *Attorney General* v. *Marr*, 55 Mich. 445; *Attorney General* v. *Preston*, 56 Mich. 177; *Mason* v. *Perkins*, 73 Mich. 303. The fixing of a time and providing for the holding of elections are legislative acts. They are surely within the power of the legislature in this instance, unless conferred upon this convention. They are not conferred in express language, and it is inaccurate to say that they do not reside in the legislature because not expressly included in the language used in section 2, which is that "the legislature * * * shall provide by law for the election of such delegates to such convention," under the well-understood rule that all legislative power is in the legislature, unless withheld by the Constitution. It is clear that the powers mentioned are not expressly withheld, any more than they are expressly conferred on the convention. See cases hereinbefore cited.

Are they impliedly conferred on the convention and therefore impliedly withheld from the legislature? If they are, it must be for the reasons:

1. That it is essential to the accomplishment of the object for which it is called that the convention have this power.

2. That the provision for a convention must be held to have, in the contemplation of the people who adopted the Constitution now existing, reference to a body of established powers, so generally understood that it must be said that such was contemplated by the people when they provided for convention, by the Constitution.

We think the first reason does not require the conclusion contended for. The Constitution does not impose upon the convention the duty of adopting and putting in force an amended Constitution. It might have so provided but has not. Had it done so, relator's contention would have force. The legislature has attempted to impose a duty in this direction, but has gone no further than to direct the proposing amendments to the existing Constitution in the shape of a revised instrument.

Under and in accordance with the existing Constitution, the legislature and the people have exercised their respective powers and functions upon this subject, and they have not attempted to delegate any legislative power in relation to the time of election, if they had power under the Constitution to do so, and the power of the convention to change the time cannot be inferred, where the legislature has itself the power and has exercised it, in accordance with its judgment, upon the ground that the convention or a court or both may entertain a different opinion upon the question of the sufficiency of the intervening period. The legislature, not the convention, is the judge of the necessity for haste, and it is not a question for the courts. The Constitution imposes but one duty on the convention, viz., a review of the Constitution. The legislature has very properly imposed another duty which the institution of this proceeding shows, an appreciation of, and a laudable willingness to comply on the part of the convention, but the legislature need not have done this. Having done it, the limitations of its language must be none the less effective. It is limited to filing and publishing the result of its labor.

The second reason given has been in effect disposed of,

and perhaps what is to follow might be omitted. But we wish to preclude any possible impression that we have not attempted to give relator's claim the consideration which the learned advocates of this contention entitle it to. We understand the claim to be, as already stated, and it may well be, that conventions have been held, where the origin, cause, and circumstances under which the delegates have assembled, justified the inference of other and greater powers than have been conferred upon this convention. Whether any constitutional conventions, other than those arising out of revolutionary conditions, which make their existence contrary to pre-existing law rather than in conformity to existing law, and those given full power of adoption and putting in force an amendment or Constitution, can be held to be endowed with all of the sovereign power of the constituency which they assume to represent, we need not decide. We are convinced, however, that this cannot be, where a convention is, in advance of its creation, deliberately made a component part of the governmental system of a State, with limited powers. To do so would, in our opinion, be to misconceive the intention of the people in adopting the system, and to wander from the spirit of the instrument through which they have sought to express it.

In this, there is no conflict with the following language of the late Chief Justice COOLEY:

"A constitution cannot from its very nature enter into a minute specification of all the minor powers naturally and obviously included in it and flowing from the great and important ones which are expressly granted. It is, therefore, established as a general rule, that when a constitution gives a general power, or enjoins a duty, it also gives, by implication, every particular power necessary for the exercise of the one or the performance of the other." Cooley on Constitutional Limitations (7th Ed.), p. 98.

This Constitution does not impose the duty of submission, but of proposing for submission, a Constitution. The contention of relator requires us not only to imply the

power necessary for the exercise of the alleged duty of submission, but to imply the alleged duty itself, as well.

In what has been and is to be said there is no intention to dispute the fact that the convention has a sphere in which the legislature cannot intrude, a discretion which it cannot control, but that discretion has its clear limitations.

In this connection, the views expressed in Jameson on Constitutional Conventions (4th Ed.), §§ 320, 321, are of interest.

" We are next to inquire into the relations of conventions to the government of the State, as a whole, and the powers growing out of those relations.

"As to the former, the substance of what I desire to say may be comprised in the discussion of a single question,—Is a convention a component part of the governmental system of the State ?

" If it is not a part of that system, certainly the difficulties of locating it and of ascertaining its powers are infinitely enhanced, for the only alternative is to consider it as imperium in imperio; a body whose powers cannot be delineated, because practically unlimited; a body having only an incidental relation, by reason of the necessities attending its birth, to the ordinary governmental agencies— the government, indeed, sustaining to it the relation not of parent or guardian, but of midwife merely—a body, finally, standing in necessary connection only with the sovereign for which it acts, or, rather, whose successor it is. On the other hand, nothing could conduce more to simplicity of view than to consider this institution as a branch of that system by which the State, considered as a political society, works out its will in relation both to itself and to the citizens of which it is composed. And this, although the subject is not free from difficulty, I am satisfied, is the correct view to take of the question. We have seen, in the first chapter, that in England— and the same is true generally in all foreign States— the power of fundamental legislation belongs to the parliament, precisely as does that of ordinary legislation; and that, for special reasons which were there detailed, a different plan has been adopted in the United States, namely, that of distinct bodies for the two species of legislation. The fact, however, that, except with us, the two species

are always united, demonstrates that there is no natural incompatibility between them. Though variant in character and importance, fundamental laws and municipal laws equally conform to the definition of laws. And certainly, the enactment of laws is the proper function of the government of a State. If it be objected that the idea of a system depending for its own renovation upon itself involves a contradiction, the reply is, that there is in it no contradiction whenever, as in every political society, the system is one operated by vital forces. This is a matter of common experience in the strictly analogous case of the animal kingdom. In the animal, those organs by which are discharged the functions of reparation and reproduction are clearly as much parts of the organism as those by which it defends itself from hostile attack, or adjusts itself to changes of its physical condition. Why should that body of functionaries which legislates for the governors, as such, be denied a place in the State governmental system any more than that which legislates for the governed? The circumstance that the former assembles only occasionally, though it doubtless leads to much of the misconception prevalent regarding it, is really a matter of no consequence in determining its true character. The frequency or infrequency of its assembling is rather one of those matters of practical detail which are determined from time to time, as may be necessary to render the convention system harmless as well as efficient. But the fact that conventions always regularly assemble on the call of the legislatures of the States concerned, indicates decisively that the convention has a place in the governmental system. Had it been the design of those who framed that system originally, to make of the convention a power outside of the circle of government, why make it dependent for its existence upon an act of a single department of that government, thus stamping upon its very front indubitable evidence of its filial relation to it?

" The probability that conventions were intended to be parts of the systems of government amongst us is increased by looking at the practical consequences of the contrary hypothesis. If they are not parts of those systems, they must be independent of them, practically, and those theorizers may be right who proclaim the incompetence of legislatures to bind conventions by their enactments. To the legislature, in that view, belongs the

ministerial duty of issuing the fiat by which the convention is spoken into being, but there its power ends. Once assembled and organized, that body slips its leash and bounds into a condition of absolute uncontrollability. It becomes potentially, at least, a realization of that remorseless monster in the human form which the fancy of Mrs. Shelley has depicted in her Frankenstein—a product of transcendent mechanical and philosophical skill, endowed with life and intelligence, but destitute of moral instincts or of practical accountability; a monster with powers so surpassing those of the philosopher who created it, that it was wholly beyond his control—he could not even kill it. In short, on this hypothesis, a convention would exhibit the anomaly of an institution, manifesting all the traits of an absolute despot, occasionally springing up alongside of a system of laws, and, during its unregulated and indeterminate existence, compelling from that system complete obedience. If this be thought to be an extreme view of the possibilities of such an institution, the answer is, that, in estimating the character of any political power, it is extremes that must be considered; for to them it is the tendency always to run. A political system can be safely characterized only by transcribing its least favorable feature, precisely as the strength of a machine is to be gauged not by that of its strongest, but by that of its weakest, part."

The case of *Wells* v. *Bain*, 75 Pa. 39, supports the doctrine here announced, viz., that the convention has constitutional powers, and constitutional powers only, and in Cooley on Constitutional Limitations (7th Ed.), p. 61, the distinguished author says:

" In accordance with universal practice, and from the very necessity of the case, amendments to an existing constitution, or entire revisions of it, must be prepared and matured by some body of representatives chosen for the purpose. It is obviously impossible for the whole people to meet, prepare, and discuss the proposed alterations, and there seems to be no feasible mode by which an expression of their will can be obtained, except by asking it upon the single point of assent or disapproval. But no body of representatives, unless specially clothed with power for that purpose by the people when choosing them, can rightfully take definitive action upon amend-

ments or revisions; they must submit the result of their deliberations to the people—who alone are competent to exercise the powers of sovereignty in framing the fundamental law—for ratification or rejection. The constitutional convention is the representative of sovereignty only in a very qualified sense, and for the specific purpose, and with the restricted authority to put in proper form the questions of amendment upon which the people are to pass."

In a note it is said:

"See, upon this subject, Jameson on the Constitutional Convention, §§ 415–418, and 479–520. This work is so complete and satisfactory in its treatment of the general subject as to leave little to be said by one who shall afterwards attempt to cover the same ground. Where a convention to frame amendments to the constitution is sitting under a legislative act from which all its authority is derived, the submission of its labors to a vote of the people in a manner different from that prescribed by the act is nugatory. *Wells* v. *Bain*, 75 Pa. 39. Such a convention has no inherent rights; it has delegated powers only, and must keep within them. *Woods's Appeal*, 75 Pa. 59."

See, also, Jameson on Constitutional Conventions (4th Ed.), §§ 418, 483.

We do not overlook the suggestion embodied in the following excerpt from *Commonwealth* v. *Griest*, 196 Pa. 410 (50 L. R. A. 568):

"The great and overshadowing distinction between this (amendment of the constitution) and ordinary legislation, lies in the fact that the organism which decides questions of constitutional amendment, is an entirely different and distinct organism from that which decides legislation, even in its broadest sense.    *    *    *    With all matters of legislation the people in their capacity of electors have nothing to do. But with constitutional amendments they have everything to do, for the ultimate fate of all proposed amendments depends absolutely upon their approval."

The application sought to be made of it is that a legislature having been commissioned only to provide a con-

-vention, the nature of the business upon which it is to engage not only precludes any interference with it in the performance of the duty of revision, but is to increase its duties as expressed in the Constitution, to the extent of giving it extensive, if not exclusive, legislative power in all things that have a relation to the final act of the people in voting upon the product of their labor, if not in all subjects, whatever they may be.

The question there was, whether the signature of the governor was necessary to the submission of an amendment proposed by the legislature, and it was held that it was not, as has been held by this court in relation to amendments under section 1. The court which is responsible for the language quoted has expressed itself in no doubtful terms regarding the limitation of the power, in *Wells* v. *Bain*, supra, and in the case from which the excerpt is taken there is nothing to indicate a different view from that expressed in *Wells* v. *Bain*.

The people have not hesitated, by article 20, § 1, to leave substantially the entire subject of amendments to the legislature, and they thereby conferred the power to practically submit a complete Constitution entirely new, without the intervention of a convention. By section 2, they have provided for a convention where they shall have indicated, in the way pointed out by the Constitution, a desire for a convention. This convention was called upon legislative initiative, and not under the 16-year requirement.

The following extracts from Jameson on Constitutional Conventions are also pertinent.

"§ 417. The principal reasons why such legislation as is necessary to submit to the people the fruits of the deliberations of a convention, should be performed by the legislature, are, *first*, that that legislation is not fundamental in its character; and, *secondly*, that a legislature, and no other body, is, under our constitutions, competent to perform that work, and that the legislature has no constitutional authority to delegate the right to perform it to any other body.

"The principles upon which the first of these proposi- tions rests have been the subject of extended examination in a former chapter, in which was considered the distinction between the two kinds of legislation specified. It needs therefore only to be remarked here, that in an act having for its purpose the submission of fundamental laws to the people, there is nothing whatever of a fundamental character. It is a simple exercise of ordinary legislation—an adapting of means to an end—depending for its particular character upon current views of expediency. Hence it is worthy of note, that such acts, even when passed in the shape of ordinances by conventions, are generally not accounted parts of the constitution. They are commonly made to figure in the schedule, which, as we have seen, is the repository of provisions intended to facilitate the transition from an order of things going out with an old, to that coming in with a new, constitution. Hence such acts, being temporary in purpose and effect, are not really proper to rank as constitutional provisions, though they have been held to be as binding upon the various departments of the government as if they had been embodied in the constitution.

" § 483. The act of assembly under which a convention meets is its charter. That whatever, not inconsistent with the constitution or the principles of the convention system, the former prescribes, the latter must do. It is the law, passed by the competent law-making power, within the limits that bound its jurisdiction. What is a convention, that it should assume to be exempt from obedience to that department of the government which is charged with higher sovereign attributes—is more nearly sovereign— than any other in it? Does it claim to be itself above the legislature? Let it show its warrant for a claim so exorbitant, for upon it must rest the burden of proving what contradicts all political analogies, and the first principles of constitutional government. It cannot find that warrant in the mandate of the power by whose fiat it came into being, for, by hypothesis, that is expressly to the contrary. It cannot find it in claims set up by conventions, and allowed by the people, in the best days of the republic, for, with scarcely an exception, during that happy period, when party conflict had not succeeded in perverting our statesmen into mere politicians, it was universally conceded, that the convention was the child of the law, and, as such, bound to obey literally its requirements.

Nor can a warrant for the claim be found in the principles which preside over the genesis and healthy growth of free communities, for whose principles, as we have seen above, require conventions to rank themselves as the servants, not the masters, of the people; and when the will of the people is known, to conform themselves scrupulously to it; but when it is unknown, to presume that to be required of them which most conduces to the safety of the Commonwealth."

The necessity for early action upon this case precludes an elaborate discussion of many interesting questions, bearing a relation to the subject. The history of constitutional conventions is suggestive of the reasons for constitutional provisions, pointing out the way that amendments may be lawfully made, and how the danger of illy considered or revolutionary amendments avoided or lessened. How far the exigency of revolutionary desires and intention are responsible for the origin of the doctrine contended for here may be open to debate, but that it has been found a convenient doctrine in such cases is undeniable. In the nature of things, the judicial consideration of this subject could not be frequent, and it could not always be a controlling question.

In this discussion we have not forgotten the fact that there have been many instances where conventions have assumed and exercised different and greater authority than that accorded in this opinion. Sometimes this has been overlooked or acquiesced in, and by the adoption or rejection of the product of the convention it has become a closed incident, leaving no trace or scar upon the body politic, except a troublesome precedent. We must not overlook, however, the difference between a question raised only after a ratification of a document by the people, and one raised contemporaneously with the act of transgression, in an effort to restrain or prevent unlawful action. In the former case, constitutions may perhaps be established though it be through irregular methods which have been, and are to be thereafter, disregarded. In the latter the courts are capable of controlling the convention

so far as to restrict it to its lawful functions and powers, unless the doctrine contended for here prevails, i. e., that it has, by delegation from the people, their sovereign power; that upon its organization it at once becomes superior to the power which has created it, and is amenable to neither the legislative, executive, nor judicial departments of government, to all of whose powers it has succeeded; that pre-existing laws are no longer binding upon it, nor are they binding upon public officers if they conflict with the mandates of the convention. If this is so, it is manifestly presumptuous for a court of justice to intervene, because we have here an institution which, though constitutional in its origin, becomes immediately upon its birth superior to all law, fundamental and municipal, both of which shrivel in the effulgence of the overpowering rays of the usurped,—instead of transferred,—political sovereignty of the convention. If this be so, the attempt at an orderly and lawful amendment of the Constitution, by prescribed methods and within constitutional limitations, is a colossal failure, for the mere establishment of the convention throws all existing law to the winds, and the body politic is left in a state of anarchy, through its misguided effort to ascertain in a constitutional manner whether it can improve its fundamental laws, which has had the astounding and unintended effect of raising a master, whose will is the only limit to its powers of government, so long as it shall remain in existence.

The principle involved in this case is of the gravest importance. Its determination involves consequences in contrast with which the fate of the pending revised Constitution is unimportant, for another convention can submit another revised Constitution which the people can, upon another day, vote upon intelligently, but if this court shall declare that it is its solemn conviction that the Constitution has created a department of government with supreme and exclusive, though unsuspected, powers, it will have placed in the hands of any future convention all the powers of government.

If, however, we are to consider the object of constitutional limitation upon the power of amendment, the plain language of our own constitutional provisions and the obvious purpose for which the convention is provided, we cannot conclude that when the delegates elected for such purpose once assemble, the entire political fabric is at their mercy, until they shall signify their willingness to allow the suspended powers of constitutional government to again become active,—if they shall not have meantime abolished them,—through an adjournment of the convention.

Since writing the foregoing, another question has arisen in another case which has a vital bearing upon this case. Counsel in this cause were therefore asked to participate in the argument in that case, and have done so. From our standpoint it is a vital question in this cause. The question relates to section 1 and its bearing on section 2, and may be stated as follows:

1. Does section 1 have any bearing upon the construction of section 2 ?

2. If so, must spring submission be limited to odd years ?

3. If section 1 has no bearing upon the construction of section 2, what, if any, limitations are there upon the power of the legislature to submit the revision to the electors at the present spring election ?

Construction of section 2. The title of article 20 indicates that it contains provisions for the regulation of the matter of amending the fundamental law. The only express limitations to be found in section 2 are that the question of the desirability of having a convention to revise must be submitted to the people once in 16 years, and that if the vote favors the proposition the legislature must provide for it. In other words, it leaves the subject of revision where it would be, had article 20 been omitted from the Constitution, except as to periodical submission of the preliminary question, in which case the legislature might still provide for a convention, and might require its sub-

mission at any time. Section 1, however, as originally passed, provides for the submission of amendments proposed by the legislature. It was not necessary to do this for it would have such authority in the absence of section 1. It is manifest therefore that section 1 was adopted for the purpose of limiting the power, and we find several limitations in it, e. g., there is a requirement of a two-thirds vote by each house of the legislature, whereas, without it, a majority would be sufficient; the proposed amendments must be entered on the journal of each house, with the yea and nay vote thereon; as originally adopted it was required to submit the same at the next general election thereafter; it also provided that a majority vote of those voting should be sufficient to ratify and approve such amendment or amendments. From the above analysis of section 1, we find several limitations upon the subject of amendments proposed by the legislature, which are not in express terms provided in case of amendments proposed through revision by a convention, e. g., the time of submission to the people, and the vote necessary to adoption.

It has been suggested that none of these should apply to section 2, because of the language, "and the same," used in section 1, which is thought to restrict its application to amendments proposed by the legislature, and although section 2 is silent it is said in that connection that under the common law, or by reason of the nature of our institutions, the same must be implied.

If this is true, it is equally unnecessary that it be inserted in section 1, for the same implications would apply to amendments proposed by the legislature. Furthermore, while it is possible that we should incline to the opinion that, in the absence of express constitutional provisions to the contrary, all amendments and all revisions by whomsoever prepared would have to be ratified by the people and that a majority vote of those voting would be sufficient, these questions are not free from dispute. Moreover, the general rules that limitations of power must be found in the Constitution if possible, and that we

should be able to point out the particular provisions which constitute such limitations, should not be overlooked; a departure from which doctrine cannot be justified, except in the case of urgent necessity, and where the propriety of the limitations is exceptionally clear.     See Justice GRAVES' (dissenting) opinion in *People* v. *Township Board of Salem*, 20 Mich. 502, for authorities upon this question; Cooley on Constitutional Limitations (7th Ed.), p. 252 et seq., and cases cited.   We conceive, therefore, that we should not rest this decision upon general implications outside of the Constitution, when by a not unreasonable construction of article 20, which might as easily have consisted of one section as two, we can find the same or similar implications, as well as others equally reasonable.

Therefore we are inclined to the opinion that the people, in adopting the Constitution of 1850, intended to express the requirement of submission to the people of all constitutional amendments, the greater as well as the less, for we are unable to see any necessity or reason for putting that matter beyond doubt, when applied to a single legislative amendment by two-thirds of each house that would not apply to a whole Constitution, proposed by a majority of one house (i. e., a convention of smaller number).

Another reason for holding some of the provisions of section 1 applicable to section 2 is found in the provision regarding submission.   We need not repeat what has been said upon the matter of legislative power in relation to submission.

Counsel urge that under the original article 20, amendments and revisions must be submitted at the next general fall election.   One suggestion is that this is necessarily so because, on general principles, they can be submitted only at a general election, and the general biennial fall election is the only such.   The vice of this is, that, *first*, it implies a limitation on the power of the legislature to submit at any time it may designate, and to provide for a State-wide vote at such time; and, *second*, if it

must submit at an established general election, where is found the implication that it must be at the next impending such election ?

It seems to us that the solution of this difficulty is found in a construction of section 2, in the light of section 1. We think that had there been no article 20, the legislature by a majority vote could have provided and submitted amendments or revisions of its own formulating or formulated through the medium of a convention at any time it saw fit, whether there should be an established election at such time or not, that it might submit upon any·day whether otherwise an election day or not. None of the extraneous implications to the contrary would avail. The same would be equally true had article 20 consisted of section 2 only.

If these conclusions are correct, there is no limitation as to time, except it is found in section 1. The limitation is to be found there.

Again, this court held in the case of *Westinghausen* v. *People*, 44 Mich. 265, that the requirement of section 1 as to a general election was a limitation on the power of the legislature to submit an amendment proposed by it in point of time.

Counsel are now contending for the same limitation as to revision under section 2. One argument is that the same limitation is found in section 2, because that section appointed the first submission of the question of a convention at a general election and that it is unreasonable that we should conclude that the subsequent submission of the result of the labor of the convention should occur at any other election. Now if section 2 stood alone, the latter proposition, i. e., that subsequent submissions upon successive 16th anniversaries should be at such general elections, would be open to doubt, and it is fair to say that as to conventions called by the legislature "at other times" it is open to still greater doubt. Is it not more reasonable to conclude, from the provisions of section 1, that all were intended to be submitted at such an election, than to

raise up so doubtful an implication from section 2, as has been suggested ? If so, then it follows that section 1, as originally adopted, provided the only limitation upon the power of submission as to time of any and all amendments. When we add the improbability of an intention to restrict the power of the legislature as to any or all amendments (and a revision is an amendment), and reflect that there is no limitation in the present Constitution on its power to submit any number of amendments, and at the same time leaving it without such restriction as to the amendment suggested by a convention, we cannot avoid the conclusion that the provision as to the submission at the next general election found in the article as originally adopted applies to both. If we are right in this, we cannot say that a change of the limitation in this regard would not and does not apply to both.

By an amendment in 1876, the word "general" was dropped. Had the word "next" also been taken out the limitation to a general election would have been withdrawn, and the legislature would have been left free to submit at any time. But the amendment did not go so far; it retained the word "next," and the words "spring or autumn" were inserted. It is not an unnatural thing to say that this new provision was to be coextensive in its application with the original one which it replaced. Indeed, we think that must be so, under the circumstances.

Must spring submission be limited to odd years ? The only vitality in this contention must rest upon the proposition that there is no State-wide election in the spring in even years, and that a constitutional amendment must be submitted at a time when all can vote—if what we have said is true.

This calls for a construction of what is meant by spring election. The only good reason for saying that even years cannot have been intended is the fact that the legislature or Constitution had not and has not yet provided

that the constitutional spring election be State-wide on even years.

As opposed to this are cogent reasons for saying that .the words " next spring election" mean what the words naturally import, and would be understood generally to mean. This is evidenced by the fact that this entire bench, in the case of *Peck* v. *Board of Sup'rs of Berrien Co.*, 102 Mich. 346, assumed that such was the meaning. Whether the language there used was obiter or not does. not affect the force of this fact. It seems to have impressed succeeding legislatures the same way, for they have repeatedly submitted amendments at the spring elections of even years. Two amendments proposed May 12, 1877, were submitted at the April election, 1878. In 1879 an amendment relating to the salary of the governor was submitted and was voted upon in April, 1880.

We naturally turn next to the occasion for this change. It was suggested by the legislature of 1875, at which session two other amendments were proposed, one to raise the salaries of State officers, and the other the amendment (section 47, art. 4) striking out the section forbidding the grant of license for sale of intoxicating liquors. Both of these amendments were likely to lead to the amendment of article 20, § 1, for the reason that they could not be submitted as the law then stood until November, 1876. There was no fall election in 1875, and they were adopted too late for submission in the spring of 1875, had it been permissible, and it is a significant fact that the amendment to section 1 would have to be construed as referring to the spring election in the even as well as the odd years to afford any relief in such a case. Of course it could afford no relief as to those particular amendments, because when they were submitted the submission could not be made earlier than the next general autumn election, as the Constitution then provided. This thought is suggested in Mr. Justice LONG's opinion in the case of *Seneca Mining Co.* v. *Secretary of State*, 82 Mich. 579 (9 L. R. A. 770), although we cannot agree with him that the *only*

purpose was to get action by the people before the legis-
lature that should submit future amendments should ad-
journ.   We think there was a broader purpose, though it
may have been one reason for the change.   Again, the
construction contended for bears just as hard upon amend-
ments made at special session after the spring elections in
the odd years, compelling a long delay before submission,
and there is little reason to believe that the people in-
tended a construction that should fail to accomplish its
object in a large proportion of the emergencies that were
intended to be provided for.

There is another thought in this connection.   It is not
improbable that the legislature considered the question of
premature submission as well as that of delay, for under
the original section there might be cases where the sub-
mission at the next fall election would be impossible, or, if
possible, unwise.   By submitting at the spring election of
the even year a delay of six months would be avoided.
It is thus plain that the contention that "next spring
election" means next spring general election, in the face
of the dropping of the qualifying word "general," limits
the effectiveness of the change.

All of these considerations are to go for naught if the
limitations to odd years is to prevail, and on no better
ground than that the election meant must have been an
*existing* State-wide election, and as applied to this case
the further ground that the language of section 1 must be
given a strict construction, for the first time, if we are
correct in what has been said before.   There is no iron-
clad rule that precludes the construction of these two sec-
tions together.   On the contrary, the canons of construc-
tion require it, if there is any uncertainty or ambiguity in
the two considered together in the light of the entire Con-
stitution.

The only reason for denying the right to submit at the
even spring elections has been said to be because there
was not then, under existing provisions of the Constitution,
State-wide elections, the reason being that on some of

those years there might be at such time, in certain cities, no election for any other purpose. Had there been a State-wide election provided for before that time, I assume that all of us would agree that there would have been no doubtful meaning in the language used, and under the rule so often invoked in this case, that the imposition of a duty or a grant of authority carries with it the implied power to do all things necessary to the end in view, the legislature would have the power to make the April election State-wide,—but an express provision was perhaps unnecessary for the reason that all of the election machinery necessary was already provided for the odd years, and the mere fact of requiring a submission at such time would, under section 1, have the effect of putting it in operation, and making it,—the spring election of 1908,—a State-wide election as the provision for the election of regents and judicial officers had already done for the odd-year election in April.

We are therefore convinced that the two sections are to be construed together, certain provisions of section 1 applying to section 2, that the admitted effect of the two sections, as originally adopted, was to require submission of all kinds of amendments at the next general autumn elections, that this was so only by the provisions of section 1, and that section, when changed, has as much effect upon section 2 as it had before, and lastly that the words "next spring and autumn elections" embraced all town meeting elections, which the Constitution by force of its amended provision makes a State-wide election whenever the legislature submits an amendment at such a time, if not already such under other provisions relating to judicial officers and regents.

The third question can be answered in a word so far as I am concerned. It would have no bearing whatever and there would be no obstacle to the fixing by the legislature of any time that they might choose, and the date which they have fixed would necessarily be the time for the vote

to be taken if section 1 has no bearing upon section 2 of article 20.

It follows that the writ should be denied.

MCALVAY, J., concurred with HOOKER, J.

MONTGOMERY, J.   Since the argument of the principal question in this case, which is fully treated in the opinions of the Chief Justice and Mr. Justice HOOKER, a new question has been presented to counsel and argued, at the suggestion of the court.   In a broad way the question is to what extent section 1 of article 20 of the Constitution should control in the interpretation of section 2.   The two sections are reproduced, and read as follows:

"SECTION 1. Any amendment or amendments to this Constitution may be proposed in the senate or house of representatives.   If the same shall be agreed to by two-thirds of the members elected to each house, such amendment or amendments shall be entered on the journals respectively, with the yeas and nays taken thereon, and the same shall be submitted to the electors at the next spring or autumn election thereafter, as the legislature shall direct; and if a majority of electors qualified to vote for members of the legislature, voting thereon, shall ratify and approve such amendment or amendments, the same shall become part of the Constitution.

"SEC. 2. At the general election to be held in the year one thousand eight hundred and sixty-six, and in each sixteenth year thereafter, and also at such other times as the legislature may by law provide, the question of the general revision of the Constitution shall be submitted to the electors qualified to vote for members of the legislature, and in case a majority of the electors so qualified voting at such election, shall decide in favor of a convention for such purpose, the legislature, at the next session, shall provide by law for the election of such delegates to such convention.   All the amendments shall take effect at the commencement of the year after their adoption."

It is obvious from the reading of these sections that the first section deals exclusively with amendments to be proposed in the senate or house of representatives and none other.   It is provided:

"If the same [these amendments proposed in either house] shall be agreed to by two-thirds of the members elected to each house, *such* amendment or amendments shall be entered on the journals, * * * and the *same* shall be submitted to the electors at the next spring or autumn election thereafter, as the legislature shall direct."

The second section makes provision for a general revision of the Constitution. No provision is therein made as to the method of submission, or as to the body which shall have authority in the matter of making the submission. There is no limitation either upon the legislature or upon the convention, if that be held to be the body authorized to take action in the premises, as to the time or manner of submitting the revision to a vote of the people. It is said, and very properly, that there is an implication arising out of the very nature of the duty reposed in the convention, and arising out of the fact that the authority is derived from the people to prepare a draft of an instrument as well as from the very character of our government, that the proposed revision of the Constitution shall not take effect until submitted to a vote of the electors.

Judge COOLEY states the law as follows:

"No body of representatives, unless specially clothed with power for that purpose by the people when choosing them, can rightfully take definitive action upon amendments or revisions. They must submit the result of their deliberations to the people—who alone are competent to exercise the powers of sovereignty in framing the fundamental law—for ratification or rejection." Cooley on Constitutional Limitations (7th Ed.), p. 61.

In Jameson on Constitutional Conventions (4th Ed.), §§ 481, 486, it is said:

"Where neither the convention act nor the constitution requires the convention to submit its work to the people, the duty of that body to do so, is, nevertheless, upon sound principles, believed to be perfectly clear. Obviously, a convention is bound to regard itself as limited to the exercise of such powers as are expressly given to it, or as are necessary to the exercise of such as are expressly given.

" If, * * * the constitution, like most of our later ones, were to authorize the legislature, in general terms, ' to call a convention,' and, if in doing so, that body were to insert in its act a provision permitting the latter to frame and put in force a constitution, without submission, would the legislature exceed its power, or would the convention be warranted in availing itself of the permission ? Laying the precedents referred to out of sight, the answer must still be in the negative, and for substantially the reasons above given. Although, from the generality of the constitutional provision, power might properly be inferred in calling a convention, to exhaust the categories of time, place, and mode of assembling, organizing, and proceeding, as well as to fill out the outlines of an expedient limitation of its powers, with a view to the safety of the State and the facilitation of its business—such details being authorized as fairly implied in the general grant of power to call the convention—nothing is authorized which is not thus implied, or which is opposed to the spirit of republican institutions."

It is clear, therefore, that section 2 in itself indicates that the work of the convention is to be submitted to the people. The fact that a convention is provided for implies that the body created shall be a convention with powers restricted by the well-understood limitations above stated. It is wholly unnecessary, therefore, to resort to section 1 for the implication that the proposed revision shall be submitted to the people. The duty to submit the revision rests either with the convention or the legislature. Mr. Justice HOOKER has undertaken, and I think successfully, to show that the duty rests with the legislature. How is that duty restricted or controlled by any provision of the Constitution? Admittedly no provision of the Constitution in terms restricts or controls the legislature in its exercise of this power, and ordinarily this bare statement would constitute a sufficient answer to a challenge of its exercise. But it is said that there is an implied limitation arising out of the fact that section 1 of article 20 provides that amendments *proposed by the legislature* shall be submitted at one of two stated elections, it being urged that the implication is that the sub-

mission must take place at one of the times so provided, or as has been suggested on the other hand, at the time provided in section 1 before the amendment of 1876 took effect. Neither suggestion should, in my judgment, be sustained. Section 1, before the amendment, required that amendments proposed by the legislature should be submitted to the electors at the next general election thereafter. If this implication arose at all under the section as it then stood, a submission of the revision must have taken place at the next general election. Entirely different considerations would control in fixing the time of the submission of amendments and the time for submitting a complete revision. In case of amendments, they would be proposed at a session of the legislature. The time elapsing from the close of the session of the legislature until the next general election was some 16 months, as a rule, and amply adequate for a consideration by the people of the terms of the proposed amendment and for full discussion. In case of a constitutional convention, however, there was no limit as to the time of holding the same. The termination of its deliberations might occur within a very few days of a succeeding election. There might, in such case, have been the best reasons for delay. The time intervening might be wholly insufficient to enable the electors to acquaint themselves with the proposed changes, which would be much more difficult in the case of a complete revision than in the case of a single proposed amendment to an article or section.

It is the most uncertain speculation to assume that had the members of the convention acted upon the subject they would have provided for the submission of a general revision at the same time as that provided for submission of amendments. Differing considerations would suggest themselves to the members of a deliberative body as affecting the two acts. In a case of amendments, it was open to the legislature to propose them at any session of the legislature. The expense of submitting such amendments at an election specially provided for that purpose may

have had influence in inducing the fixing of the time for their submission at that of a general election, and this consideration may have outweighed the consideration, which must have been well understood, that the time of the most acute political excitement is not the time best suited to securing the deliberative and dispassionate action of the electorate. But it may have been thought, in the case of a single amendment, the question would be so clear and distinct that it was perfectly safe to submit it on such an occasion. Whereas if we are to speculate as to what induced the omission of any limitation in section 2, it may well be surmised that when it came to submitting to the people a *code* of fundamental law, invoking their action upon the same, a function which it was intended to impose at infrequent intervals—at first it was intended to be at intervals of 16 years—power to divorce such action from partisan politics and to give it more the character of deliberative studied action was intended.

I refer to this not to urge that we should assume that such considerations in fact controlled the convention of 1850, but to demonstrate the danger of assuming to judge of what might have been inserted in the Constitution had there not been an entire failure to speak on the subject. Such excursions into the realm of speculation are exceedingly dangerous.

In *Westinghausen* v. *People*, 44 Mich. 265, Justice CAMPBELL, in dealing with the subject of amendments proposed by the legislature under the authority of section 1, said:

" We have no means of knowing what were the reasons which led the several members of the constitutional convention to prefer a submission at the fall election. It may be presumed it was an idea, which facts have always warranted, that more votes are cast at that election than at other times."

The lapse of years has not added to our facility in determining what was in the mind of the members in proposing section 2. What was true of section 1 when

Justice CAMPBELL wrote is true today of section 2. We have no means of knowing what were the reasons which led the several members of the constitutional convention to make no provision as to the time at which a general revision of the Constitution should be submitted. It is enough for us to know that they did not make such a provision.

"Where the power is granted in general terms, the power is to be construed as coextensive with the terms, unless some clear restriction upon it is deducible from the context. We do not mean to assert that it is necessary that such restriction should be expressly found in the context. It will be sufficient if it arise by necessary implication. But it is not sufficient to show that there was, or might have been, a sound or probable motive to restrict it. A restriction founded on conjecture is wholly inadmissible." 1 Story on the Constitution, § 424.

It cannot be, therefore, that the convention of 1850 intended to so circumscribe the legislature in fixing the time for the submission of this amendment. This being so, it must be assumed that there was reposed in the legislature a discretion as to the time of submitting the amendment to the people. The very necessity of submission implies of course that the revision shall be submitted to a vote of all of the electors of the State, because they are all equally interested and entitled to a vote upon the question. Beyond this, there is no implication except from the fact that a general election for other purposes has been provided in the Constitution. This has never been construed as fixing the time of elections other than those specifically provided for.

In the case of a revision, of course the submission to the people must be special in any case, and if the implication is raised that the submission must be at a general election, it arises out of the bare fact that a submission must be made to the electors, and it would follow that whenever an election is provided in the Constitution and not otherwise provided for, an election to take place in November

is intended.   Such, however, has not been the interpretation.   Article 4, § 37, provides:

" The legislature may declare the cases in which any office shall be deemed vacant, and also the manner of filling the vacancy, where no provision is made for that purpose in this Constitution."

Article 5, § 10, provides, in substance:

The governor may issue writs of election in case of vacancy in the office of senator or representative.

Article 10, § 3, provides:

"In each organized county there shall be a sheriff, a county clerk, a county treasurer, a register of deeds and a prosecuting attorney, chosen by the electors thereof, once in two years, and as often as vacancies shall happen."

It will be noted that probate judges are not included in this list.

Article 6, § 14, provides:

" When a vacancy occurs in the office of judge of the supreme, circuit or probate court, it shall be filled by appointment of the governor, which shall continue until a successor is elected and qualified."

It will be noted that this section by implication provides that there shall be an election.   If that very fact that the Constitution requires that an election to an office shall be had imports that such election shall be had at the November election, it would follow that the legislature has no authority to provide an election at another time.   Just as suggested here that because the submission is contemplated it follows that it must be made at that time.   But we have direct authority that the legislature may, in such a case, provide for holding such an election.   *People* v. *Lord*, 9 Mich. 227.

In the case of *Westinghausen* v. *People*, 44 Mich. 265, the court was dealing with a case where an amendment had been submitted at a general election held on the first Tuesday after the first Monday in November, 1876, and

the plaintiff claimed that a general election was held in April, 1875, at which the amendment should have been submitted. The court, construing section 1 of article 20 as it stood before the amendment of 1876, held that the provision that the amendment should be submitted at the next general election thereafter had reference to the general election on the first Tuesday succeeding the first Monday in November, as that was the only general election dealt with in the Constitution of 1850. It is quite a different proposition than it is to read into a requirement, either express or implied, that a proposition shall be submitted to the people or that an election shall be held, a requirement that that election shall be held at a specific time which is fixed in the Constitution for entirely other and distinct purposes.

If, however, section 1 is to be considered as read into section 2, and as by implication controlling the authority of the legislature in the premises in submitting a revision, it would make necessary consideration of the question as to whether there had been any action of the legislature in violation of section 1 by providing for a submission of the revision on the first Monday in April. For in my view it should not be held that if section 1 placed an implied limitation upon the authority of the legislature when it was originally adopted, that that implied limitation continued for all time, irrespective of any amendment made to section 1. Any such rule would give to a statute or constitutional provision more drastic control over subjects with which it does not deal than it admits over the subject with which it directly deals. See *In re Executive Communication*, 15 Fla. 735.

In 2 Lewis' Sutherland on Statutory Construction (2d Ed.), § 443, it is said:

"All consistent statutes which can stand together, though enacted at different dates, relating to the same subject, and hence briefly called statutes in pari materia, are treated prospectively and construed together as though they constituted one act. This is true whether the acts

relating to the same subject were passed at different dates, separated by long or short intervals, at the same session or on the same day.   They are all to be compared, harmonized if possible, and, if not susceptible of a construction which will make all of their provisions harmonize, they are made to operate together so far as possible consistently with the evident intent of the latest enactment."

This question was dealt with by Mr. Justice CARPENTER in *People* v. *Kriesel*, 136 Mich. 80.   The question there presented was whether Labor Day, which was not, at the time of the enactment of the statute requiring saloons to be closed on legal holidays, a holiday, was, by having been subsequently designated as a holiday by statute, brought within the terms of the act.   It was held that such was the effect.   In the opinion the case of *State* v. *Kidd*, 74 Ind. 554, is cited.   In that case the defendant was convicted of the unlawful sale of intoxicating liquor on the day of a municipal election.   The opinion was based on an act passed in 1877 making it unlawful to sell liquor upon the date of any State, county, township, primary or municipal election.   The act authorizing the municipal election in question in that case was not passed until 1879.   The court held that the statute providing for the municipal election brought such election within the terms of the statute.

"Where an act or portion of an act is amended 'so as to read' in a prescribed way, the section amended is entirely repealed, and as to all matters contained in the original enactment, and not incorporated in the amendment, the latter must be held to have the effect of a repeal." *People* v. *Hiller*, 113 Mich. 209.

"All the provisions of the prior law amended which continue in force after the passage of the amendatory act derive their force thereafter not from the original but the amendatory act, and as to the future the old act or section is repealed in toto.                                    .

"The effect of an amendment of a section of the law is not to sever it from its relation to other sections of the law, but to give it operation in its new form as if it had been so drawn originally, treating the whole act as a har-

monious entirety, with its several sections and parts mutually acting upon each other." 1 Lewis' Sutherland on Statutory Construction (2d Ed.), § 237, pp. 443, 444.

As to analogy between statute and constitution, see *People* v. *May*, 3 Mich. 598, 605, and *Smith* v. *Railway Co.*, 114 Mich. 470.

This line of cases demonstrates that if section 2 had provided that a revision of the Constitution should be submitted to the people at the time provided in section 1, and section 1 had thereafter been amended, as it has been, the amendment of section 1 would have fixed the time for holding elections under section 2. It is to be noted that we are dealing now with a constitutional revision in which no question arises as to the necessity of having re-enacted and republished the second section to make the amendment effective. I have referred to this as meeting suggestions made in argument, not because I assent in any sense to the proposition that section 1 is either directly or by implication a limitation upon the powers of the legislature. I rest my conclusion in this case wholly upon the ground that no restriction having been placed upon the authority of the legislature in submitting the revision except such as is implied from the very nature of the duty to be performed, that such submission may take place at any time determined by the legislature when a State-wide election can be held and the electorate be given an opportunity to express their approval or disapproval of the proposed revision.

The statement that, "We cannot construe section 2 without looking at section 1," begs the very point in controversy and decides it by mere assertion. No one has undertaken to point out that section 1 is not complete in itself, nor that it does not refer to a distinct subject, nor that it does not in terms limit the restriction as to the submission at stated elections and times to such amendments as are proposed by the legislature itself. Nor has it been gainsaid that section 2 is complete in itself. As I have pointed out, it is not necessary to go to section 1 to find

the implication that the question of the adoption or rejection should be submitted to the electors, and as I have shown by the authority of Mr. Jameson, a general submission implies the authority to make choice of time and means.

The suggestions which have been offered to show that the change in section 1 by the amendment of 1876 has not had the effect of changing the date at which it is competent to submit an amendment under section 2, to my mind furnishes an answer to the contention that section 1 is to furnish the source, and the only source, of implication as to the authority of the legislature in submitting a revision of the Constitution under section 2.

Referring to the change in 1876, it is asked,—

"Does it change the time at which the revised Constitution proposed by a convention shall be submitted ? That depends upon the intention of the people. In *giving* to the legislature authority to determine when amendments proposed by itself should be submitted, did the people intend to change the time for submitting a *revised Constitution* proposed by a convention ?"

In place of this inquiry, let us put another: In *restricting* the authority of the legislature to submit amendments proposed by itself, did the people in *1850* intend to *fix* the time for submitting a revised Constitution proposed by a convention ?   It is said:

"It was certainly competent for the people to grant to the legislature this authority over amendments proposed by itself without changing the time of submitting a revised Constitution proposed by a convention."

It may be said with equal force that it was certainly competent for the people in *1850* to *restrict* the authority of the legislature in submitting amendments proposed by itself without restricting them as to fixing the time of submitting a revised Constitution proposed by a convention.

It is suggested:

"Notwithstanding the fact that in construing section

2 we look at the language of section 1, the people could amend section 1 without changing section 2."

And it is suggested:

"For the purpose of ascertaining what section 2 meant at the time of its adoption, we should look at the language of section 1 as it was before it was amended in 1876. And section 2 is to be construed as it was before the amendment was made, unless it was the intent of the people, when making the amendment in 1876, that its construction should be changed."

I have endeavored to point out in this opinion that if the two sections are to be construed in pari materia, the construction which is to be placed upon either is to be based upon the condition of the two enactments at the time such construction is invoked. But it is attempted to deduce from this section as amended the idea that,—

"In deciding to grant the legislature authority to determine when amendments proposed by itself should be submitted, the *electors had no occasion* to consider when a *proposed revision* of the Constitution should be submitted. That *was a very different question* from the one they were called upon to consider. That was a subject not brought to their attention by any proposed amendment to section 1. That was a subject which depended upon a proper construction of section 2."

Why should it not be said of the Constitution of *1850* that in deciding to *restrict* the authority of the legislature in submitting amendments proposed by itself the electors in dealing with that section had *no occasion* to consider the question of a proposed revision of the Constitution? Why should it not be said that that *was not a subject brought to their attention* by section 1? Why should it not be said that that was then a subject which depended upon a *proper construction* of *section 2?*

I am unable to understand how the people, in adopting the *amendment* to section 1, can be found to have excluded wholly from their consideration any question of its effect upon section 2, while the people of 1850, in adopting the original section 1, must be understood to have had the

whole subject completely in mind.   I know of no way of making any such distinction.

As indicated by this opinion, it is my belief that the legislature was well within its powers in providing for the submission of this revision on the first Monday in April.

The application for the writ should be denied.